***FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER***

**Electronically Filed
Supreme Court
SCAP-15-0000106
11 MAY-2016
08:33 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

NARCIS D. SALERA; GLENN E. COMPANION; UNITED PUBLIC WORKERS,
AFSCME, LOCAL 646, AFL-CIO; JOHN DOES 1-10; AND JANE DOES 1-10,
Respondents/Plaintiffs-Appellees/Cross-Appellants,

vs.

KIRK W. CALDWELL, Mayor, City and County of Honolulu;
CAROLEE C. KUBO, Director, Department of Human Resources,
City and County of Honolulu; LORI M. K. KAHIKINA, Director,
Department of Environmental Services, City and County of
Honolulu; and CITY AND COUNTY OF HONOLULU,
Petitioners/Defendants-Appellants/Cross-Appellees,

and

JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE
PARTNERSHIPS 1-10; ROE NON-PROFIT ORGANIZATIONS 1-10; AND ROE
GOVERNMENTAL ENTITIES 1-10 (2014-013),
Defendants.

SCAP-15-0000106

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-15-0000106; CIV. NO. 14-1-2655-12)

MAY 11, 2016

RECKTENWALD, C.J., NAKAYAMA, POLLACK, AND WILSON JJ., AND
CIRCUIT JUDGE GARIBALDI, IN PLACE OF McKENNA, J., RECUSED

OPINION OF THE COURT BY POLLACK, J.

This case concerns the decision of the Department of

Environmental Services of the City and County of Honolulu to

discontinue frontloader collection services to 181 multi-unit residential buildings and non-profit organizations.  We address whether the elimination of these government services is prohibited by constitutional merit principles under Article XVI, Section 1 of the Hawai'i Constitution and civil service statutes.

## I.    BACKGROUND

Frontloader collection services[1] are part of the City and County of Honolulu's (City and County) solid waste collection and disposal system, regulated pursuant to Hawai'i Revised Statutes (HRS) § 340A (2010) and Chapter 9 of the Revised Ordinances of the City and County of Honolulu (ROH). The Department of Environmental Services (the Department) is the county agency responsible for administering the collection and disposal of refuse.  HRS § 340A-3; ROH § 9-1.3(a) (1990).

In 1998, United Public Workers, AFSCME, Local 646, AFL-CIO (collectively, UPW)[2] and the City and County entered into a Memorandum of Agreement in which the City and County agreed, inter alia, to the following: (1) restore collection services on

---

[1]    "Frontloader collection service" is defined as "refuse collection service using an owner-provided, three-cubic yard container which requires no manual moving, no manual lifting by city personnel and is lifted over the front of the collection vehicle."  ROH § 9-1.2 (1990).

[2]    UPW exclusively represents 8,364 blue collar non-supervisory employees in bargaining unit 1, including thirteen refuse collection crew leaders and refuse collectors on the City and County's front-end loader work crews.

O'ahu that had previously been privatized; and (2) expand frontloader collection services to businesses, condominiums, and churches.  This agreement was enforced through proceedings before the Hawai'i Labor Relations Board.  Several appeals ensued in which the Circuit Court of the First Circuit (circuit court) ordered the City and County to cease and desist from repudiating the agreement with UPW and honor in good faith the agreement's terms.  After unsuccessfully appealing the circuit court's order to this court, the City and County restored frontloader refuse collection services to multi-family properties and non-profit organizations that had previously been privatized.  For approximately the last ten years, six front-end loader work crews, consisting of refuse collection crew leaders and refuse collectors from the Honolulu, Pearl City, and Kapa'a baseyards, have utilized seven front-end loader trucks to service 1,615 dumpsters twice a week for 181 multi-family residences and non-profit properties as well as for 51 City agencies.[3]

In July 2014, following the City Council's decision to no longer provide funds for the procurement of front-end loader collection vehicles, the Department's Director Lori Kahikina

---

[3]     Respondent Narcis Salera is a refuse collection crew leader who has been employed as a civil servant since November 29, 2006 to provide refuse collection services on O'ahu.  Respondent Glenn Companion is a refuse collector who has been employed as a civil servant since July 1, 2007 to provide similar services.

decided to discontinue frontloader collection services to the 181 multi-unit residential properties and non-profit organizations, effective January 31, 2015. The Department sent notices to the affected properties, which included a list of contact information for fourteen private haulers who potentially might be able to provide refuse collection services. The 181 entities were urged to "make arrangements with a private refuse hauling company for [replacement] service[s]" and were asked to inform the City and County if they intended to "shift to private hauling services sooner than January 31, 2015."

The Department also advised UPW by letter regarding the discontinuance of the frontloader collection services to the 181 properties. The Department cited to the "unfair distribution of city service[s] and resources" and "diminishing resources," including "insufficient equipment to continue the service[s] and no prospects of being able to acquire additional equipment," as reasons for discontinuing frontloader collection services. Additionally, the Department reassured UPW that "[a]ll employees will retain their current positions and yard assignments, and will continue to perform work in accordance with their position descriptions. Front loader service will continue to be provided to approximately 50 City agency facilities."

In a responsive letter, UPW objected to the decision to end frontloader collection services, stating that the Department's "unilateral decision" violates "the duty to negotiate and to obtain mutual consent" pursuant to various agreements. UPW maintained that the City and County had not negotiated any modifications to the mutual agreement to restore and expand refuse collection services. Accordingly, UPW requested negotiations and asked the City and County to cease and desist from discontinuing frontloader refuse collection services and to suspend notification of the cancellation of these services pending negotiations. UPW also sought responses to an information request included in its letter.

In its reply to UPW's information request, the Department recognized that there were some monetary savings to ending this government service but cited "general equity and non-monetary concerns" as the primary reasons for its decision to discontinue frontloader refuse collection services. In a subsequent letter to UPW, the City and County indicated, inter alia, that "any impact will be nominal, as all employees will continue their employment and will continue to be based at their existing baseyard. Impacted employees' rate of pay and benefits will remain the same, and their scope of work remain as manual collection." The City and County declined to rescind any

notices of the discontinuation of refuse collection services to the affected properties.

Of the 181 properties, 116 entered into contracts with private licensed collectors. One of the licensed collectors had at least 41 locations with pending contracts while another had at least 63 pending contracts.

## A. Complaint

On December 31, 2014, Narcis Salera, Glenn Companion, and UPW (collectively, the Union) sued the City and County of Honolulu, Mayor Kirk W. Caldwell, Human Resources Director Carolee C. Kubo, and Director Kahikina (collectively, the City) in circuit court. The Complaint stated four claims: (1) a violation of constitutional merit principles under Article XVI, Section 1 of the Hawai'i Constitution (count 1); (2) a violation of civil service laws pursuant to HRS § 46-33 (count 2); (3) a violation of the right to collective bargaining under Article XIII, Section 2 of the Hawai'i Constitution (count 3); and (4) a violation of public policy and ultra vires contrary to the judgment entered in Civil Nos. 03-1-0546-03 and 03-1-0552-03 (count 4). The Union provided the 181 affected entities with a copy of the Complaint.

## B. Injunction Order

On January 13, 2015, the Union filed a motion for a temporary restraining order and a preliminary injunction

(Injunction Motion) seeking to enjoin the City from unilaterally implementing the privatization of the frontloader collection and disposal services at issue. The City opposed the motion, contending that its decision to discontinue frontloader collection services did not constitute impermissible privatization but was instead a non-justiciable political question. A notice of the Injunction Motion and hearing was sent to the 181 properties and non-profit organizations. The circuit court granted the Union's Injunction Motion by written order entered on January 30, 2015 (Injunction Order), concluding that the Union demonstrated a strong probability of success on the merits of the alleged violations of merit principles (counts 1 and 2).

The circuit court found that for approximately the last ten years, the City and County has provided refuse collection services through the use of six front-end loader work crews, consisting of refuse collection crew leaders and refuse collectors, to service 1,615 dumpsters twice a week for the 181 properties and numerous City agencies. The court determined that the refuse collection services for the 181 properties have historically and customarily been performed by civil servants employed by the City and County pursuant to HRS § 46-33 and the merit principles under Article XVI, Section 1 of the Hawai'i Constitution. Further, the court found that the City had not

sought or obtained the required certifications or approvals required to exempt the refuse collection services from the civil service system and that there were no statutory exemptions that apply to the positions or personal services in question.

The circuit court stated that the decision to discontinue these services was made, inter alia, by Director Kahikina and that "general equity and non-monetary concerns" were the primary reasons for the decision. The court determined that the City Council did not adopt an ordinance or resolution to require the City and County to discontinue the public refuse collection services to the 181 properties and that the civil servants on front-end loader crews are available to provide these services on or after January 31, 2015. The court found that the City and County notified the 181 properties of its intent to discontinue the frontloader collection services effective January 31, 2015 and urged the owners to "make arrangements with a private refuse hauling company for (replacement) services."

The circuit court also determined that the nature of the services provided by the refuse collection crew leaders and refuse collectors are "virtually identical" to the services provided by private hauling companies' truck drivers and collectors. The court further determined that unless it granted the injunction, then the City and County's decision would

"eliminate three (3) of the six (6) front end loader work crews, reassign refuse collection crew leaders and refuse collectors to new routes, and reduce the City's frontloader collection services by approximately 89 percent on January 31, 2015." Although frontloader collection services would continue for 51 City agencies, the court found that the City and County's decision to terminate these services to the 181 properties will "directly impact at least 13 civil servants and result in irreparable injury" to the Union. The court stated that there was no evidence presented indicating that granting the injunction would cause irreparable injury to the City.

The circuit court then examined the merit principles under Article XVI, Section 1 of the Hawai'i Constitution and the civil service laws at HRS §§ 76-77 and 46-33. To determine whether privatization was involved, the court applied the nature of services test set forth in Konno v. County of Hawai'i, 85 Hawai'i 61, 937 P.2d 397 (1997), which the court summarized as follows: "services that have been customarily and historically provided by civil servants cannot be privatized absent a showing that civil servants cannot provide those services or that the services are subject to a specific statutory exemption." The circuit court concluded that the City and County's "cancellation" of frontloader collection services was "in effect a shift from government provision of functions and services to

provision by the private sector" and thus constituted impermissible privatization.  The court further noted that it was undisputed that the services provided by the civil service employees would have been replaced by private businesses and observed that the City and County contemplated this when it decided to terminate the refuse collection services to the 181 properties.

Additionally, the court reasoned that the personal services provided by the refuse collection crew leaders and refuse collectors are within the civil service unless one of the exemptions of HRS §§ 46-33 and 76-77 applies.  Because the City did not assert the applicability of an exemption and because no exemptions apply, the court concluded that the front-end loader work crew positions are within the civil service and thus governed by Article XVI, Section 1 of the Hawai'i Constitution. Accordingly, the court ruled that, based on the evidence presented, the Union demonstrated a strong probability of success on counts 1 and 2.

The circuit court rejected the City's contention that this case involves a non-justiciable political question.  The court reasoned that "as the privatization of the front end loading services is a prohibitive practice which does not allow for negotiations, only legislative action may alter the civil

service statutes through statutory enactment." The court concluded that no such legislative statute had been enacted.

Finding that the Union established the required elements for a temporary restraining order and preliminary injunction, the circuit court granted the Union's Injunction Motion and enjoined the privatization of frontloader refuse collection and disposal services to the 1,615 dumpsters at the 181 properties.

### C. Motion for Partial Summary Judgment

The Union then filed a motion for partial summary judgment on counts 1 and 2 and sought to make its temporary injunction permanent. In opposition, the City argued that its decision to end frontloader collection services did not involve Konno privatization, did not violate any civil service laws, and concerned a non-justiciable political question.[4]

The circuit court granted the Union's motion for partial summary judgment by written order entered on February 26, 2015 (Partial Summary Judgment Order), ruling that the Union was entitled to final partial judgment as to counts 1 and 2.[5]

---

[4] The City did not expressly raise any arguments related to the joinder of necessary and indispensable parties under Hawaiʻi Rules of Civil Procedure (HRCP) Rule 19 in its Memorandum in Opposition to the Injunction Motion and Memorandum in Opposition to the Union's motion for partial summary judgment.

[5] At the hearing on the motion for partial summary judgment, the circuit court stated that it was granting the motion as to counts 1 and 2

(continued. . .)

11

The court also permanently enjoined the City from discontinuing public refuse collection and disposal services to the 181 properties.

The circuit court entered an order certifying the Partial Summary Judgment Order for appeal (Certification Order), which also stayed the proceedings as to counts 3 and 4. The court determined that, pursuant to HRS § 641-1(b), the appellate court's affirmance of the circuit court's ruling on counts 1 and 2 and the rejection of the political question argument would moot the remaining claims, thereby leading to a "speedier termination of litigation." Additionally, based on the reasoning that the interlocutory appeal could moot counts 3 and 4, the court stayed the proceedings as to counts 3 and 4, pursuant to HRCP Rule 62(d) and (e), and also the proceedings related to costs and fees under HRCP Rule 54(d). Over the City's objection, the circuit court certified the Union's request to appeal the Certification Order.

The City filed an appeal from the Partial Summary Judgment Order, and the Union filed a cross-appeal from the

_____

(. . .continued)

based on the court's "reasons on the issues previously given for the TRO as well as the preliminary injunction."

12

Certification Order.[6]  On August 4, 2015, the case was transferred to this court.

## II.      STANDARDS OF REVIEW

### A. Summary Judgment

Appellate courts review an award of summary judgment de novo under the same standard applied by the circuit court. Thomas v. Kidani, 126 Hawai'i 125, 127-28, 267 P.3d 1230, 1232-33 (2011).  This court articulated that standard as follows:

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Id. at 128, 267 P.3d at 1233 (quoting Fujimoto v. Au, 95 Hawai'i 116, 136, 19 P.3d 699, 719 (2001)).  This court must review the evidence and inferences in the light most favorable to the non-moving party.  Id. at 128, 267 P.3d at 1233.

### B. Constitutional Law: Political Question Doctrine

The appellate court reviews questions of constitutional law de novo under the right/wrong standard. Onaka v. Onaka, 112 Hawai'i 374, 378, 146 P.3d 89, 93 (2006).

---

[6]      On June 29, 2015, the State of Hawai'i filed an amicus curiae brief, supporting the City's position that Konno does not extend to situations where the government decides to eliminate services.  On October 16, 2015, the County of Kaua'i joined the State's amicus curiae brief.

### III.    DISCUSSION

On appeal, the City asserts that the circuit court erred: (1) in concluding that the termination of frontloader collection services to the 181 properties constituted impermissible privatization; (2) in adjudicating political questions related to legislative budget decision-making and the executive branch's decision to eliminate government services; and (3) in enjoining and entering judgment against the City when all interested and necessary parties, such as the 181 property owners and private haulers who had already entered into contracts, were not joined in the lawsuit where joinder was feasible.[7]

---

[7]    The Union filed a cross-appeal, raising procedural issues related to the Certification Order.  The Union first contends that the appellate court lacks jurisdiction because the circuit court erred in certifying the appeal under HRS § 641-1(b), not HRCP Rule 54(b).  However, the appeal was not from a final judgment, and therefore HRS § 641-1(b) applied to the interlocutory appeal of the Certification Order.  Alternatively, the Union maintains that the circuit court abused its discretion in determining that an interlocutory appeal was advisable for the "speedy termination of litigation" under HRS § 641-1(b).  The circuit court concluded that if the appellate court affirms its grant of partial summary judgment, then counts 3 and 4 will be substantially, if not entirely, resolved.  The circuit court's determination was therefore not an abuse of discretion.

The Union also asserts that the circuit court lacked any legal basis for granting a stay of further proceedings as to counts 3 and 4.  Although the circuit court incorrectly cited HRCP Rule 62 in the Certification Order, a court has inherent authority to stay proceedings pending an interlocutory appeal.  See HRS § 603-21.9 (1972); City & County of Honolulu v. Ing, 100 Hawai'i 182, 193 n.16, 58 P.3d 1229, 1240 n.16 (2002) (describing the court's discretion and inherent power to stay proceedings).  Thus, the circuit court did not abuse its discretion in staying counts 3 and 4 because, as indicated by the court, the stay in this case may avoid unnecessary litigation.  Consequently, the February 26, 2015 Certification Order is affirmed.

14

Accordingly, the dispositive issue on appeal is whether the City and County's decision to terminate frontloader refuse services to the 181 properties violated State constitutional merit principles and civil service laws.[8]

## A. Privatization Principles and Their Application to This Case

It is well-recognized that the term "privatization" encompasses a wide variety of activities.  Konno v. County of Hawai'i, 85 Hawai'i 61, 68, 937 P.2d 397, 404 (1997). "Privatization [generally] refers to the shift from government provision of functions and services to provision by the private sector."  Id. (quoting George L. Priest, Introduction: The Aims of Privatization, 6 Yale L. & Pol'y Rev. 1, 1 (1988)).  There

_____

[8]    The City also contends that the circuit court erred in failing to rule on the issue of joinder of "necessary and indispensable" parties under HRCP Rule 19(a).  Because the City failed to timely raise the issue of joinder, the City waived its HRCP Rule 19(a) defense.  See Marvin v. Pflueger, 127 Hawai'i 490, 502, 280 P.3d 88, 100 (2012) (indicating that the failure to raise the lack of joinder of necessary parties under HRCP Rule 19(a) may be waived).

Even if the City had properly raised the issue of joinder, the requirements of HRCP Rule 19(a) would not be satisfied.  First, the private haulers and 181 property owners and residents are not bound by the circuit court's decision in this case such that complete relief for the Union or the City is not dependent on whether these non-parties participated in the lawsuit.  Second, none of the non-parties have claimed an interest relating to the litigation, and any potential valid claim by the private haulers against the City has not been compromised.  Third, the disposition of this case does not subject the City or the Union to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of" any claimed interest.  See HRCP Rule 19(a).  Consequently, even assuming the City had properly raised the issue of joinder pursuant to HRCP Rule 19(a), the circuit court would not have been required to order joinder of the private haulers and 181 entities.

are many forms of privatization, including contracting out and government service shedding.  Donald G. Featherstun et al., State and Local Privatization: An Evolving Process, 30 Pub. Cont. L.J. 643, 646–48 (2001).

Contracting out is defined as "the transfer by governmental entities of responsibility for the performance of desired functions, mostly of a personal service (i.e. administrative) nature, to private institutions" or "the replacement of members of [a] bargaining unit by the employees of an independent contractor performing the same work under similar conditions of employment."  Konno, 85 Hawai'i at 68, 937 P.2d at 404 (quoting Timothy P. Dowling, Note, Civil Service Restrictions on Contracting Out by State Agencies, 55 Wash. L. Rev. 419, 419 n.3 (1980)).  Government service shedding occurs when the government "simply decides to stop providing a certain service or function, leaving it to the private sector to fill the need if a demand exists."[9]  Featherstun et al., supra, at 647.

---

[9]    For example, if a city decides to no longer provide bus transportation to residents, "residents and potential entrepreneurs would then be left to their own devices regarding the ability to travel in the city."  Shirley L. Mays, Privatization of Municipal Services: A Contagion in the Body Politic, 34 Duq. L. Rev. 41, 44-45 (1995).  Thus, government withdrawal from an activity or from responsibility for providing services in this manner constitutes privatization.  Id.

In Konno, this court recognized that privatization "involves two important, but potentially conflicting, policy concerns." Konno, 85 Hawai'i at 74, 937 P.2d at 410. Privatization has the potential to increase the efficiency of public services, but it can also undermine the policies behind the civil service system, such as the "elimination of the spoils system and the encouragement of openness, merit, and independence." Id. States have employed different approaches to address the tension between privatization and the civil service system. Id. at 69-70, 937 P.2d at 405-06. This court adopted the nature of services test, id. at 72, 937 P.2d at 408, which states that "services that have been 'customarily and historically provided by civil servants' cannot be privatized, absent a showing that civil servants cannot provide those services." Id. at 69, 937 P.2d at 405 (quoting Wash. Fed'n of State Emps. v. Spokane Cmty. College, 585 P.2d 474, 477 (1978)). Under this approach, civil service law protections extend to services that have been customarily and historically provided by civil servants, unless the services are subject to a statutory exemption. Id. at 72, 937 P.2d at 408.

In concluding that the privatization effort at issue in Konno violated constitutional merit principles and civil service laws, this court emphasized that the Hawai'i Constitution and State statutes "strongly support the policies underlying the

civil service." Id. at 75, 937 P.2d at 411. The court observed that the significant public policies underlying the civil service system necessitate careful consideration and regulation of any privatization effort. Id. at 74, 937 P.2d at 410. Indeed, the court noted that it is the legislature's role to make policy decisions in favor of privatization and that it would be inappropriate for the courts to usurp that role. Id. at 74-75, 937 P.2d at 410-11. That is, only a statute, not a government official's unilateral decision, may expressly authorize the privatization of a public service. See id.

On appeal, the City contends that the circuit court erred in concluding that the City and County's decision to end frontloader collection services to 181 multi-family residential and non-profit properties constituted impermissible privatization under Konno. The City argues that Konno is factually and legally inapplicable because the termination of frontloader collection services does not result in any shifting of services from civil servants to private businesses. In its amicus curiae brief, the State maintains that privatization should only include situations where the government stops using its employees and uses private employees, pursuant to government contracts, to perform the same service.

However, the broad definition of privatization as the "shift from government provision of functions and services to

18

provision by the private sector," id. at 68, 937 P.2d at 404 (quoting Priest, supra, at 1), encompasses the type of privatization that is at issue in this case: government shedding of service, or the situation when government decides to stop providing certain services and leaves it to private entities to fill the need. Featherstun et al., supra, at 647. While the Department did not terminate all refuse collection services to Oʻahu residents, private haulers are filling the demand for the services that the City and County had previously provided to the 181 properties. Consequently, the circumstances of this case constitute a form of contracting out set forth in Konno--"the replacement of members of [a] bargaining unit by the employees of an independent contractor performing the same work under similar conditions of employment." Konno, 85 Hawaiʻi at 68, 937 P.2d at 404 (quoting Dowling, supra, at 419 n.3). Thus, contrary to the City's and the State's argument, privatization under Konno is not limited to situations where the government stops using government employees and transfers to the private sector the same services through government contracts. Therefore, this case involves privatization.

**B. Under Konno's Nature of Services Approach, the Frontloader Collection Crew Leader and Collector Positions Are Within the Civil Service.**

Article XVI, Section 1 of the Hawaiʻi Constitution concerns constitutionally mandated merit principles and provides

19

in relevant part: "The employment of persons in the civil service, as defined by law, of or under the State, shall be governed by the merit principle."  As stated in Konno, this constitutional provision "does not establish an independently enforceable right to the protection of merit principles." Konno, 85 Hawaiʻi at 70, 937 P.2d at 406.  Rather, it requires an examination of statutory and case law to determine which particular positions fall within the civil service system.  Id.

HRS § 76-77 (Supp. 2008), the most relevant statute in defining the scope of the civil service, states in part:

> **Civil Service and exemptions.**  The civil service to which this part applies comprises all positions in the public service of each county, now existing or hereafter established, and embraces all personal services performed for each county, except the following:
>
> . . . .
>
> (10)  Positions specifically exempted from this part by any other state statutes . . . .

HRS § 76-77 (emphases added); see also Konno, 85 Hawaiʻi at 71, 937 P.2d at 407.

The statutory application of the civil service, encompassing "all positions" and "all personal services," is sufficiently broad to require constraints on a government official's ability to privatize services that might circumvent the protections of the civil service.  See Konno, 85 Hawaiʻi at 71, 937 P.2d at 407.  While the definition of civil service does not encompass all positions that provide a service to the

20

public, such as the employees of businesses providing electrical or telephone services, the term is also not limited to only employees paid regular government salaries because that would allow public officials to circumvent civil service coverage "simply by reducing the size of their official payroll." Id. at 71-72, 937 P.2d at 407-08.

In interpreting this term, the Konno court applied the nature of services test, which was considered to be the most consistent with the statutory language in HRS § 76-77. Id. at 72, 937 P.2d at 408. The nature of services test provides that "services that have been 'customarily and historically provided by civil servants' cannot be privatized, absent a showing that civil servants cannot provide those services." Id. at 69, 937 P.2d at 405 (quoting Wash. Fed'n of State Emps., 585 P.2d at 477). Applying this test, this court held that "the civil service, as defined by HRS § 76-77, encompasses those services that have been customarily and historically provided by civil servants." Id. at 72, 937 P.2d at 408. The Konno court observed that the nature of services test has several advantages, including (1) using broad language consistent with the statutory language in HRS § 76-77; (2) limiting coverage based on the types of services historically and customarily provided by civil servants such that the test cannot be applied so broadly as to lead to absurdity; and (3) focusing on the

21

types of services and actual work performed, not the "particular programs or governmental functions involved or the intent or motive underlying the decision." Id.

The nature of services test does not require a contractual relationship between government and private entities or individuals. See id. Indeed, the Konno court rejected the argument that HRS § 76-77 requires a contract, concluding that "nothing in the statute requires a formal employment contract." Id. at 75, 937 P.2d at 411. Specifically, this court noted that "if HRS § 76-77 required a formal employment contract with the individual worker, the government could easily circumvent the statute by obtaining services through an intermediary corporation," which could "potentially take all public services outside the civil service system" and "render HRS § 76-77 a nullity." Id. The court emphasized that the nature of services test focuses on the nature of the positions and services provided by civil servants, not on whether a formal contract existed between the government and individual employees. Id.

In this case, the frontloader refuse crew leaders and frontloader refuse collectors provide essentially the same job function as those performed by truck drivers and collectors of private licensed haulers. The actual work performed and the manner in which it is performed is basically the same. It is undisputed that the frontloader refuse crew leaders and

22

frontloader refuse collectors hold civil service positions and that they have been providing these services for approximately the last ten years.

Additionally, the private licensed haulers' refuse collection services are replacing the exact same services provided by the City's front-end loader work crews.  City and County officials in fact contemplated that employees of private businesses would replace frontloader refuse crew leaders and collectors when they sent notices to the 181 properties regarding the elimination of frontloader collection services. We therefore conclude that, under the Konno test, the frontloader collection crew leader and frontloader refuse collector positions are within the civil service because these positions have been customarily and historically performed by civil servants for at least the last ten years.

The City contends that this case is distinguishable from Konno because the City and County has not entered into any contract with a private hauler, which would have displaced City and County employees.[10]  As discussed, this argument was

_____

[10]     The City also contends that the termination of frontloader collection services does not result in privatization because "frontloader collection worker" is not a civil service status classification.  However, as discussed supra, the services performed for these positions are essentially the same.  Thus, the exact title of the position is a distinction without a difference because the nature of services test "focuses on the types of services performed rather than the particular programs or governmental

(continued. . .)

specifically rejected by the Konno court.  Id. at 75, 937 P.2d at 411.  The court explained that requiring a formal contract or payment could take all public services outside of the merit system whenever a public official or government agency unilaterally decides to eliminate a service without a statute expressly authorizing such an action.  See id.  In this case, while there is no formal employment contract between the City and County and any private hauler, there are pending contracts between a majority of the 181 entities and private haulers.  Thus, the City and County has essentially provided the refuse collection services through an "intermediary corporation," enabling the circumvention of HRS § 76-77.  Id.

        The City also argues that Konno's nature of services test does not apply because the City and County's decision to terminate frontloader collection services does not impact the pay, benefits, or terms and conditions of employment of front-end loader work crews.  However, the City did not challenge the circuit court's finding as to the nature and extent of the impact upon the affected civil service employees.[11]

---

(. . .continued)

functions involved or the intent or motive underlying the decision."  Konno, 85 Hawai'i at 72, 937 P.2d at 408.

    [11]    As stated, the circuit court found that termination of the frontloader services would have directly impacted at least thirteen civil servants, eliminated three of the six front-end loader work crews, reassigned

(continued. . .)

Additionally, the Konno court did not consider whether the County of Hawaii's privatization effort resulted in loss of pay, jobs, or benefits to the landfill workers at issue. See id. at 65, 72-74, 937 P.2d at 401, 408-10 (stating that the "actual work performed by the workers at the new landfill is virtually identical to the work performed at the old landfill"). Konno thus indicates that the actual impact of the City and County's decision on civil servants is not a requirement under the nature of services test. See id. Instead, "the protection of civil service laws extends to those services that have been customarily and historically provided by civil servants." Id. at 72, 937 P.2d at 408.

In the alternative, the City argues that because both the City front-end loader work crews and private haulers have provided frontloader refuse collection services in the past, there cannot be any finding that these services have been historically and customarily provided only by public employees. The City contends that HRS § 340A-3(a)[12] and ROH §§ 9-3.1 and 9-

_____

(. . .continued)

refuse collection crew leaders and refuse collectors to new routes, and reduced the City's front-end loader services by approximately 89 percent on January 31, 2015.

[12]     HRS § 340A-3(a) (2010) provides in relevant part:

The county agency responsible for the collection and disposal of solid waste may require that all solid waste

(continued. . .)

3.4 (1990)[13] expressly recognize that private licensed collectors and their employees have also provided refuse collection services.  However, contrary to the City's contention, <u>Konno</u>'s nature of services test does not require that the services in question be <u>exclusively</u> performed historically and customarily by civil servants.  See <u>Konno</u>, 85 Hawaiʻi at 69, 937 P.2d at 405.[14]  Further, the nature of services test considers the <u>specific</u> public services at issue, not broadly all similar services that may be provided by both the private and public sectors.  See <u>id.</u> at 71-72, 937 P.2d at 407-08.  Therefore, the City's contention is contrary to the <u>Konno</u> court's interpretation of HRS § 76-77 as applying broadly to "<u>all</u>

---

(. . .continued)

> transported <u>by the county agency, collectors, businesses or individuals</u> be disposed of at facilities or in areas designated by the county agency if it is found to be in the best public interest; provided that agricultural solid waste and source separated waste transported for recycling purposes shall not be subject to the provisions of this section; and provided further that if regional transfer stations are designated, transportation to the stations shall be considered so as to minimize the operating costs of the collector.

HRS § 340A-3(a) (emphasis added).

[13]    ROH § 9-3.1 (1990), entitled "Business," and ROH § 9-3.4 (1990), entitled "Multi unit residential buildings," relate generally to the refuse collection and disposal system for these types of entities.

[14]    If the nature of services test considered all similar services performed by both the public and private sectors, then, arguably, if civil servants provided 99% of a particular service and the private sector provided 1% of similar services, the civil servant positions would not qualify for protection under the constitutional merit principles and civil service laws.

26

positions" and "all personal services."  See id. at 71, 937 P.2d at 407.

Further, in order to exempt a service, and thereby a civil service position, from the merit system, the State legislature must enact a statute expressly authorizing the privatization of that service.  See id. at 74-75, 937 P.2d at 410-11.  Statutes and ordinances that set standards for regulating refuse collection and disposal services, such as HRS § 340A-3(a) and ROH §§ 9-3.1 and 9-3.4, do not amount to an exemption of refuse crew leader and refuse collector positions from the civil service system.  Consequently, the front-end loader crew leader and collector positions are within the civil service unless one of the exemptions enumerated in HRS § 76-77 applies.

**C. The Positions Are Not Exempt from the Civil Service System.**

If a position falls into one of the exemptions enumerated in HRS § 76-77, then that position is not part of the civil service system.  Only one of the exceptions in HRS § 76-77 could possibly apply to the facts of this case.  HRS § 76-77(10) provides that positions are not within the civil service if other State statutes specifically exempt the positions from the civil service.  As noted, the City maintains that HRS § 340A-3(a) and ROH §§ 9-3.1 and 9-3.4 are the relevant provisions at issue.  However, HRS § 340A-(3) and ROH §§ 9-3.1 and 9-3.4 do

27

not address whether the frontloader collection positions are exempt from the civil service.  The Union, on the other hand, argues that the relevant exemption statute is HRS § 46-33 (1993), which provides in relevant part:

> **Exemption of certain county positions.**  In any county with a population of 500,000 or more, the civil service to which this section refers is comprised of <u>all</u> positions in the public service of such county, now existing or hereafter established, and embraces <u>all</u> personal services performed for such county, except the following:
>
> . . . .
>
> (7) Personal services obtained by contract where the director of civil service has <u>certified</u> that the service is special or unique, is essential to the public interest and that, because of circumstances surrounding its fulfillment, personnel to perform such service cannot be obtained through normal civil service recruitment procedures.  Any such contract may be for any period not exceeding one year.

HRS § 46-33 (emphases added).

Although the City and County has a population of 500,000 or more, none of the enumerated exemptions provide that the front-end loader crew positions are not within the civil service.  See HRS § 46-33.  Further, it is undisputed that the City did not seek or obtain the required certification required under HRS § 46-33(7) to exempt refuse collection service positions from the merit system.  Because HRS § 46-33 does not include a specific exemption, HRS § 76-77(10) is inapplicable, and frontloader refuse crew leader and collector positions are within the civil service.

Additionally, the civil servants in question can provide frontloader refuse collection services.[15] Thus, the City and County's decision to terminate, and thereby privatize, frontloader refuse collection services "deprived civil servants of the protections guaranteed in article XVI, section 1 and HRS chs. 76 and 77." Konno, 85 Hawai'i at 74, 937 P.2d at 410.

## D. Only a Statute May Authorize the Privatization of Public Services.

The City contends that Konno should not be applied broadly to situations in which the government decides to terminate certain public services, and, similarly the State contends that the City and County should have the authority to discontinue certain services for whatever reasons it may have.[16] While these arguments raise important policy concerns underlying the civil service system and privatization, the Konno court addressed this policy tension by adopting the nature of services test. Konno, 85 Hawai'i at 69-72, 937 P.2d at 405-08.

---

[15] The City does not expressly challenge on appeal the circuit court's factual findings as to the following: (1) the decision to discontinue these services was made, inter alia, by Director Kahikina for "general equity and non-monetary concerns," and (2) the civil servants on front-end loader crews are available to provide these services to the 181 properties on or after January 31, 2015.

[16] The State, joined by the County of Kaua'i, maintains that it would be a "radical and unjustified expansion of the civil service laws to construe them as forcing government to continue providing services it no longer wishes to provide at all." Correlatively, the State asserts that if the government terminates a public service, then that service is no longer part of the civil service system and cannot be privatized.

It is the State legislature's role, not that of this court or the City and County, to authorize the privatization of public services.  See id. at 74-75, 937 P.2d at 410-11.  That is, if the State legislature determines that the government no longer wishes to provide certain services or functions, then the legislature may mandate that the City and County shift the provision of the services from the government to the private sector.  The Konno court indicated that the State legislature is in the best position to navigate the policy concerns underlying privatization.  See id. at 75, 937 P.2d at 411 ("Whether or not, as a policy matter, private entities should be allowed to provide public services entails a judgment ordinarily consigned to the legislature.").  If the State legislature expressly authorizes the termination of a public service, then that service may be duly privatized, and the job positions providing that service can be removed from the civil service system and no longer guaranteed the protections of HRS Chapter 76.  See id.

For example, following the Konno decision, the State legislature provided a statutory exemption, through Act 90, that specifically authorized privatization.  See 1998 Haw. Sess. L. Act 230 §§ 14, 17 at 789-800; 2001 Haw. Second Sess. L. Act 90 at §§ 2 and 14 at 158-59, 168.  However, Act 90, expressly provided that Part II, entitled "Privatization," "shall be repealed on June 30, 2007."  2001 Haw. Second Sess. L. Act 90 at

30

§ 14 at 168.  The Act thereafter was repealed by operation of law, and there is no other similar statute that generally authorizes the government to engage in the privatization of services.[17]  2001 Haw. Second Sess. L. Act 90 at § 14 at 168.

Here, the State legislature did not enact a statute to expressly authorize or require the privatization of frontloader collection services to the 181 properties.  Therefore, the City and County had no authority to privatize these public services.  See Konno, 85 Hawai'i at 75, 937 P.2d at 411 (finding that "there is no statute that expressly addresses privatization of public landfills").  Because City and County officials cannot themselves authorize the discontinuance of a public service and thus the privatization of that service, the Department and its officials lacked authority to discontinue the frontloader collection services.

### E. This Case Does Not Involve a Non-Justiciable Political Question.

The City also contends that the circuit court erred in adjudicating a political question involving the legislative branch's budget decision-making and the executive branch's decision that resulted in the elimination of certain

---

[17]    A more recent example of a legislative enactment authorizing a specific privatization effort is HRS § 323F-52 (Supp. 2015), which expressly authorizes the privatization of one or more Maui medical facilities of the Maui regional system.

governmental services.  This court has adopted the United States Supreme Court's view of the political question doctrine, recognizing that "the use of 'judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context." Trs. of the Office of Hawaiian Affairs v. Yamasaki, 69 Haw. 154, 171, 737 P.2d 446, 456 (1987) (quoting Life of the Land v. Land Use Comm'n, 63 Haw. 166, 171-72, 623 P.2d 431, 438 (1981)).  In determining whether the political question doctrine should apply, this court has applied the test set forth in Baker v. Carr, 369 U.S. 186 (1962).  Nelson v. Hawaiian Homes Comm'n, 127 Hawai'i 185, 194, 277 P.3d 279, 288 (2012).

Under the Baker test, a case involves a non-justiciable question if any of the following circumstances applies: (1) the issue is committed to another political department; (2) there is a lack of "judicially discoverable and manageable standards" for resolving the issue; (3) it is impossible to decide the issue without "an initial policy determination of a kind clearly for nonjudicial discretion"; (4) the court cannot independently resolve the issue without "expressing lack of respect due coordinate branches of government"; (5) the issue requires the "unusual need for unquestioning adherence to a political decision already made";

or (6) various departments may decide the issue differently, leading to the "potentiality of embarrassment from multifarious pronouncements." Id. (quoting Yamasaki, 69 Haw. at 170, 737 P.2d at 455). "Unless any of [the applicable] formulations [from the Baker test] is inextricable from the case at bar, dismissal for nonjusticiability is unwarranted." Id.

This court has also recognized that the political question doctrine applies when an issue is clearly committed to the legislative branch and when the legislature "remains uncertain about the subject matter at issue or when resolution of the uncertainty has already been committed to the legislature." Id. at 196, 277 P.3d at 290. However, where an issue involves "textual interpretation, particularly constitutional interpretation," that issue is "generally judicial fare." Id. at 197, 277 P.3d at 291. Thus, this court has concluded that "a court is to interpret constitutional questions as long as there do not exist uncertainties surrounding the subject matter that have been clearly committed to another branch of government to resolve." Id.

In this case, the constitutional question presented is whether the City and County's termination of frontloader refuse collection services is prohibited by State constitutional merit principles and civil service statutes. This case does not involve any of the circumstances set forth under the Baker test,

but rather it concerns the "textual interpretation, particularly constitutional interpretation" of Article XVI, Section 1 of the Hawai'i Constitution and HRS §§ 76-77 and 46-33, which is considered "generally judicial fare." Id. Further, nothing indicates that this issue is committed to the legislature or that there are any uncertainties surrounding this issue.

The budget decision-making of the City Council and the Department's decision to terminate frontloader refuse collection services are not the equivalent of a legislative enactment. That is, the actions of the City and County's legislative and executive branches alone cannot authorize privatization and alter the civil service statutes. Therefore, the issue presented does not concern the separation of powers and consequently is not a non-justiciable political question.

## IV.    CONCLUSION

Accordingly, under HRS § 76-77 and applying the nature of services test, the frontloader refuse crew leader and collector positions are within the civil service and governed by merit principles under Article XVI, Section 1 of the Hawai'i Constitution and HRS Chapters 76 and 77. See Konno, 85 Hawai'i at 74, 937 P.2d at 410. Thus, the City and County's decision to terminate frontloader refuse collection services to the 181 properties violated constitutional merit principles and civil service laws and deprived the civil service workers in this case

34

of the protections guaranteed in Article XVI, Section 1 and HRS Chapters 76 and 77.  Because there is no genuine issue of material fact presented and no non-justiciable political question involved, the circuit court did not err in granting partial summary judgment in favor of the Union as to the asserted violations of merit principles in counts 1 and 2.

Therefore, we affirm the circuit court's February 26, 2015 "Order Granting Plaintiffs' Motion for Partial Summary Judgment Filed on February 20, 2015" and the February 26, 2015 "Order Granting in Part Defendants City and County of Honolulu, Kirk W. Caldwell, Carolee C. Kubo, and Lori M.K. Kahikina's Motion to Certify Orders Granting Plaintiffs' Motion Temporary Restraining Order and for Preliminary Injunction and for Partial Summary Judgment (Counts 1 and 2) and to Stay Proceedings Pending Appeal."  We also remand the case to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Donna Y. L. Leong and Ernest H. Nomura for petitioners | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Herbert R. Takahashi and Rebecca L. Covert for respondents | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |
| Kimberly Tsumoto Guidry and Girard D. Lau for amicus curiae, State of Hawai'i | /s/ Colette Y. Garibaldi |

