Electronically Filed
Supreme Court
SCWC-13-0002125
06-SEP-2017
08:07 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

RENE UMBERGER, MIKE NAKACHI, KA'IMI KAUPIKO, WILLIE KAUPIKO,
CONSERVATION COUNCIL FOR HAWAI'I, THE HUMANE SOCIETY OF THE
UNITED STATES, and CENTER FOR BIOLOGICAL DIVERSITY,
Petitioners/Plaintiffs-Appellants,

vs.

DEPARTMENT OF LAND AND NATURAL RESOURCES, STATE OF HAWAI'I,
Respondent/Defendant-Appellee.

SCWC-13-0002125

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0002125; CIVIL NO. 12-1-2625-10 JHC)

SEPTEMBER 6, 2017

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

For a nominal fee per year, the Department of Land and

Natural Resources (DLNR) authorizes the collection of fish or

other aquatic life for aquarium purposes (aquarium collection)

by issuing permits pursuant to Hawaii Revised Statutes (HRS) § 188-31 (2011) and its administrative rules. Subject to certain terms and conditions contained in the permit and restrictions provided by statutes and administrative rules, each commercial aquarium collection permit authorizes the extraction of an unlimited number of fish or other aquatic life annually from the State's coastal waters. DLNR also issues recreational aquarium collection permits that authorize an annual catch limit for each permit of almost 2,000 fish or other aquatic life. The fundamental issue presented in this case is whether aquarium collection pursuant to permits issued under HRS § 188-31 and DLNR's administrative scheme is subject to the environmental review procedures provided in the Hawai'i Environmental Policy Act (HEPA). We hold that commercial aquarium collection under HRS § 188-31 and DLNR's administrative rules is subject to HEPA's requirements. We further hold that the record is not adequate for this court to determine whether recreational aquarium collection may be exempt from HEPA. Accordingly, we remand this case to the circuit court for further proceedings to resolve the issue of whether recreational aquarium collection under HRS § 188-31 and DLNR's administrative rules is also subject to HEPA.

## I. FACTS AND PROCEDURAL HISTORY

Petitioners Rene Umberger, Mike Nakachi, Ka'imi Kaupiko, and Willie Kaupiko identify themselves as concerned Hawai'i citizens, avid divers, and subsistence fishermen. Petitioner Conservation Council for Hawai'i is a nonprofit organization based in Hawai'i with approximately 5,500 members worldwide whose mission is to protect native Hawaiian species and to restore native Hawaiian ecosystems for future generations. Petitioner Humane Society of the United States, a national nonprofit organization with over 11 million members, is dedicated to the protection of wildlife and habitat. Petitioner Center for Biological Diversity is a nonprofit organization dedicated to preserving, protecting, and restoring biodiversity, native species, ecosystems, and public lands; the organization has approximately 450,000 members, many of whom live in Hawai'i. Respondent Department of Land and Natural Resources (DLNR) is the state agency that holds the statutory authority to issue permits for aquarium collection.

On October 24, 2012, Petitioners filed a complaint for declaratory judgment and injunctive relief in the Circuit Court of the First Circuit (circuit court) specifically challenging fifty aquarium collection permits that DLNR had issued in the

120 days before the filing of the complaint.[1]  The complaint sought (1) a declaration that DLNR is in violation of HEPA, chapter 343 of the HRS, for failing to complete the HEPA review process prior to approving the challenged permits; (2) a declaration that DLNR's issuance and renewal of these permits without complying with HEPA is invalid and illegal; (3) an injunction enjoining collection under the challenged permits until DLNR fully complies with HEPA; and (4) an injunction enjoining DLNR from approving, renewing, or issuing any aquarium collection permits prior to completing a HEPA review of the issuance of the challenged permits.[2]  DLNR filed an answer requesting a dismissal with prejudice of Petitioners' complaint.

Thereafter, DLNR moved for summary judgment, arguing that (1) DLNR's practice of not requiring environmental review of applications for aquarium collection permits is entitled to deference and (2) environmental review is not required for aquarium collection permits because there is no action initiated by an applicant requiring agency approval (applicant action).[3]

---

[1]    In addition to these named permits, Petitioners challenged any other aquarium collection permits renewed or granted by DLNR in the 120 days prior to the filing of their complaint.

[2]    The complaint also requested that the circuit court retain continuing jurisdiction to review DLNR's compliance with all judgments and orders.

[3]    The Honorable Jeannette H. Castagnetti presided over the proceedings in this case.

In support of DLNR's motion for summary judgment, Alton K. Miyasaka, an aquatic biologist in DLNR's Division of Aquatic Resources, submitted a declaration.  Miyasaka averred that "[a]nyone who applies for a permit pursuant to [HRS] § 188-31 and who goes through the above process receives a permit" and that DLNR "does not have and does not exercise discretion with respect to the permits."  Thus, according to Miyasaka, the process does not involve discretionary consent and there is no applicant action.

Petitioners opposed DLNR's motion for summary judgment, contending that (1) DLNR's failure to comply with HEPA prior to issuing aquarium collection permits is not entitled to deference because the aquarium collection permitting statute is clear and not subject to agency interpretation and (2) aquarium collection is a HEPA "action" subject to DLNR's discretionary consent.

Petitioners cross-moved for summary judgment, contending that (1) HEPA mandates environmental review of aquarium collection permits and (2) the issuance of aquarium collection permits is subject to DLNR's discretionary consent. In support of Petitioners' summary judgment motion, they attached (1) the declarations of Gail Grabowsky, Petitioner Umberger, Petitioner Nakachi, Petitioner Ka'imi Kaupiko, Petitioner Wilfred Kaupiko, Marjorie F.Y. Ziegler, Inga Gibson,

Miyoko Sakashita, and Dane Enos; (2) excerpts of The Report to the Twenty-Fifth Legislature on the Findings and Recommendations of Effectiveness of the West Hawai'i Regional Fishery Management Area [hereinafter The Report to the Twenty-Fifth Legislature][4]; (3) excerpts of Hawaii's State of the Reef, published by DLNR's Division of Aquatic Resources[5]; and (4) DLNR's approval of Disney Aulani's request for a special activity permit to collect aquarium fish for a period of one year in order to stock a saltwater swimming pool.

Gail Grabowsky, an associate professor at Chaminade University and the Director of the University's Environmental Studies Program,[6] stated that commercial aquarium collectors

---

[4]     Petitioners relied on this report in asserting that "[o]ver 200 species are collected for the aquarium trade in Hawai'i," that "the level of aquarium collection along the west coast of the island of Hawai'i have documented substantial increases, i.e., 25 percent between 2000 and 2010, in the number of collectors and in the collection of certain species," and that aquarium collection permits allow the collection of species that are "particularly vulnerable to depletion."

[5]     Petitioners relied on this publication in explaining that DLNR is charged as the steward of Hawaii's natural resources, including ocean ecosystems, and that DLNR manages the fourth longest coastline in the United States, including 410,000 acres of coral reefs. Petitioners also used this publication in contending that DLNR itself has previously recognized the detrimental effects of removal of reef fish on the coral reef ecosystem and that further studies in this area are necessary if this activity is to continue.

[6]     Grabowsky holds a bachelor's degree and a doctorate in zoology from Duke University, has authored or co-authored various published scientific works, and has received several honors, scholarships, and grants in her field. As relevant here, her research has focused on ornamental reef fish collection on O'ahu, marine invertebrate zoology, molecular/morphological evolution, coral reef health, sea bird habitat conservation, sea bird by-catch reduction, box jellyfish dispersal, and natural history in Hawai'i.

self-report to DLNR the type and quantity of marine animals that they collect and that this practice results in underreporting because commercial collectors "may either fail to turn in catch reports or inaccurately quantify their catch."  Grabowsky explained that "[a]quarium collectors utilize modern and ever-improving technologies, like scuba equipment, highly camouflaged wetsuits, nitrox (a mix of nitrogen and oxygen, usually with a higher-than-normal level of oxygen to extend dive time), GPS systems, and underwater scooters, to increase their ability to locate aquarium fish."[7]

According to Grabowsky, "although aquarium collection is prohibited along 35% of the west coast of the island of Hawai'i, less than 1% of the remaining area around the Main Hawaiian Islands is protected."[8]  Grabowsky opined that the drastic differences in species abundances between well-protected areas and those that are not "reveal[] that aquarium collection is removing and having detrimental effects on species that play important ecological roles in reef ecosystems."  Because the most heavily fished species are herbivorous algae eaters,

_____

[7]    Grabowsky declared that aquarium collectors at times also use underwater blankets to cover the reef so that fish would not be able to take refuge in the coral.

[8]    Based on other studies, Grabowsky declared that "there has been a severe depletion of fish" in the Main Hawaiian Islands when compared to the diversity and population of fish in the Northwestern Hawaiian Islands.

Grabowsky stated that their removal from the reef ecosystem decreases the reef's ability to withstand habitat degradation and could result in an algal-dominated reef.  Grabowsky found that "the most greatly affected species are those that have been heavily exploited."  Grabowsky's survey of relevant studies indicated "that certain rare, vulnerable species are under intense collection pressure, and the effects of collection on many of their populations [are] unknown."[9]

Grabowsky explained that aquarium collection typically focuses on juvenile fish because they are smaller and more aesthetically pleasing and thus more popular to customers. According to Grabowsky, this "can result in top-heavy age distributions of many of the heavily collected species on reefs, and means that there are fewer juveniles in reef ecosystems that are able to grow up to reproduce as adults."

Based on her research and review of relevant scientific literature, Grabowsky concluded that "aquarium collection is having a detrimental effect on fish populations around O'ahu and in other areas of the state," it "disrupts the ecosystems and makes them less able to respond to other

---

[9]     According to Grabowsky, some of these vulnerable species, such as Tinker's butterflyfish and psychedelic wrasse, have been listed on DLNR's "Species of Greatest Conservation Need," but they are still being collected without any limits.

stressors," and "it removes animals that occupy important and unique ecological niches." Grabowsky opined that prohibiting collection in certain areas does not adequately address the problem in that, "while it may slow the disappearance of the fish species and reef degradation, . . . it will not prevent it." Finally, Grabowsky declared that the "data showing that the current permitting system and designation of protected areas adequately protects the reef ecosystems is lacking."

Petitioner Umberger also submitted a declaration stating that she had been diving professionally since 1983 and had done at least 10,000 scuba dives around the Main Hawaiian Islands and in various international locations. Umberger stated that, based on her observations during her dives through the years, fish species that are highly prized by the aquarium trade have abruptly disappeared from a lot of dive sites.[10]

Based on Umberger's experience diving and snorkeling along the west coast of the island of Hawai'i, she declared that there is a marked difference in the condition between those reefs that are open to collection and those that are not: reefs

---

[10] For example, Umberger explained that the three dragon eels (which could retail for over a thousand dollars apiece) and several flame angelfish that she had been seeing in the Red Hill area of south Maui for years had disappeared. In addition, during the years that she had spent scuba diving, Umberger stated that she saw corals physically broken apart to expose the crevices in the reef.

open to collection have fewer colorful and aesthetically pleasing fish and invertebrates. Umberger also attested that she had "noticed a dramatic reduction in biodiversity on reefs and in the density of species of fish that are collected by the aquarium trade." Finally, Umberger opined that DLNR's current permitting practices "will have irreversible, negative consequences for Hawai'i's reef ecosystems and [her] interests in enjoying and protecting these precious areas."

Petitioner Nakachi also submitted a declaration in support of Petitioners' summary judgment motion. Nakachi stated that he is a resident of Kailua-Kona on the island of Hawai'i and a scuba diving tour operator since 1987 who has gone on tens of thousands of scuba dives, both recreationally and as part of his scuba diving tour business, in and around Hawai'i waters for the past forty years. According to Nakachi, his "recreational and aesthetic interests in seeing healthy reef ecosystems full of colorful fish are harmed by aquarium collection under the challenged permits." Nakachi also averred that his economic interests are harmed because his business relies on a healthy marine environment in order to be successful. Nakachi described his experience in which a dive site that was once populated by colorful fish species experienced a decline in the fish population and coral damage when aquarium collectors discovered

the dive site's location.[11]  Over the years that he had spent diving in the waters of Hawaiʻi, Nakachi observed "negative changes on the coral reefs . . . because of aquarium collection, particularly along the west coast of the island of Hawaiʻi." Based on Nakachi's diving experience in State waters, he declared that "[t]here is a very noticeable difference in aquarium fish species' populations and coral damage between the areas that are open to collection and the areas that are closed."  Nakachi averred that his clients "have expressed concern . . . about the changes they see on the coral reefs where they dive," the fact that there are fewer fish in the reefs, and damaged corals.  According to Nakachi, these concerns had prompted his clients not to dive in Hawaiʻi anymore.

Nakachi echoes Grabowsky's description of the technology he had observed aquarium collectors use over the years, see supra.  Based on the decline that he had witnessed in aquarium fish population and the health of corals where he dives, Nakachi stated that he is "afraid that [the] reef ecosystems will continue to decline until they are not able to sustain marine life anywhere near the previous levels."

---

[11]     One site on the island of Hawaiʻi had "no fish left" by 2006 when Nakachi went back to scuba dive there.

Petitioners Ka'imi Kaupiko and Wilfred "Willie" Kaupiko also submitted declarations in support of Petitioners' summary judgment motion. The Kaupikos are Native Hawaiian subsistence fishermen living in the village of Miloli'i, which is located on the west side of the island of Hawai'i. They attested that their cultural, subsistence, and aesthetic interests are harmed by DLNR's issuance of aquarium collection permits without first engaging in HEPA review "because aquarium collectors remove species of fish that [they] fish for" and because they had "noticed a substantial decline in the variety and number of fish on reefs along the west coast of Hawai'i over the past decade." Based on the Kaupikos' experience, when they had gone out fishing, they had hardly seen any types of fish that are collected by the aquarium trade, even in areas near Miloli'i that are closed to collection.[12]

Ka'imi Kaupiko stated that the dwindling number of fish affects his ability to feed himself and his family and negatively impacts the ecosystem of which they are a part. Ka'imi also declared that he had noticed coral dying after being damaged by boat anchors and pollution and that "removal of fish

---

[12] Willie Kaupiko stated that he had seen, in January and November 2012, aquarium collectors taking fish in areas where collection is prohibited.

for aquarium collection further disrupts an already-stressed ecosystem." Ka'imi attested that "[t]he reefs on the west coast of the island of Hawai'i do not look as healthy as they used to" and that he is "worried about the ability of [the] reef ecosystems to survive so that future generations can continue fishing and practicing . . . Native Hawaiian traditions."[13]

The Kaupikos concluded that aquarium collection under the challenged permits affects their ability to catch fish for food, disrupts the ecosystem, hurts the reef's ability to withstand harm from things like pollution and physical damage, and harms their cultural, subsistence, recreational, and aesthetic interests, as well as their ability to use, enjoy, and protect the ocean and coral reefs for future generations' use and education.

Marjorie Ziegler, the Executive Director of Petitioner Conservation Council for Hawaii, and Miyoko Sakashita, a staff member of Petitioner Center for Biological Diversity (CBD), submitted declarations stating that the members of their respective organizations are harmed by DLNR's aquarium collection permitting system "because it threatens to impair

---

[13] Because Ka'imi Kaupiko is involved in educating young people in Miloli'i about Hawaiian cultural traditions involving fishing and the ocean, he also declared that aquarium collection affects his "ability to educate children in the village about healthy reefs and fish populations."

their aesthetic, subsistence, and recreational interests in using, enjoying, and protecting the State's reefs."[14] They further averred that "DLNR's failure to comply with its legal obligations deprives" their organizations and their "members of both the information that would be generated through the HEPA process and the opportunity to participate actively in the process of environmental review."

Inga Gibson, the Hawai'i State Director of Petitioner Humane Society of the United States (HSUS), declared that DLNR's issuance of aquarium collection permits without HEPA review "adversely affects HSUS's organizational interests in protecting animals from unnecessary harm, suffering, and death, as well as its members' and supporters' ability to protect, observe, and enjoy Hawai'i's coral reef animals and ecosystems that are and will be affected by collection under the challenged permits." Gibson averred that aquarium collectors remove types of fish that serve a larger role in reef ecosystems, a practice that "has negative effects on other marine species that inhabit coral reefs." Gibson also stated that HSUS views "aquarium collection as a harmful, disposable trade, because up to forty percent of fish may die before reaching their final destination and many of

---

[14] Sakashita also stated that CBD's members, including herself, "regularly use Hawai'i's coastal waters for recreation, aesthetic enjoyment, observation, research, and other educational activities."

the collected fish are not suitable for living in captivity, surviving only a fraction of their natural lives." Gibson concluded that DLNR's permitting regime "affects HSUS's members' recreational, aesthetic and educational interests in protecting, studying, and observing these fish and invertebrates and their coral reef habitats."

Dane Enos, a resident of Kailua-Kona and a former commercial aquarium fish collector, submitted a declaration in support of Petitioners' summary judgment motion describing the procedure he followed in collecting aquarium fish before he left the trade. Enos explained that his "decisions about which species to take and how many animals to collect were based on consumer demand." Once he received an order for a particular species from a wholesaler, he would "go out to the reefs to try and fill that order" and that "[t]he price [he] would get paid . . . would fluctuate depending on whether the wholesalers already had that particular species of fish in their shops." Enos's practice was to "operate[] on a fourteen to eighteen month system of rotation at sites where [he] collected[] to give fish time to reproduce before going back to the same spot." Enos declared that his commercial aquarium collection permit allowed him "to take an unlimited type and quantity of species from coastal waters" and "to collect anywhere in the State of Hawai'i other than in areas . . . where aquarium collection was

prohibited." Enos stated that, when he first started collecting in 1985, there were not as many collectors as there were when he left the trade in 2002. At the tail end of his participation in the trade, Enos described how other collectors would take "fish from the same spot too frequently, affecting the number of animals and the balance of the ecosystem." Some collectors, according to Enos, also broke off finger corals so as to create a uniform surface for their nets. Enos attested that "after witnessing collectors over-harvesting fish and invertebrates and damaging the reefs, in addition to the stress on the reefs from other factors, like pollution, [he] decided that [he] could not continue collecting" and left the trade.

DLNR opposed Petitioners' motion for summary judgment, reiterating its position that there is no HEPA "action" and no "approval" involved in aquarium collection and that the environment is not harmed by the current permitting system. In support of its opposition, DLNR submitted a declaration from Alton Miyasaka, averring that DLNR's Division of Aquatic Resources "continually monitors and studies populations of fish and other aquatic life potentially affected by aquarium fish permits issued pursuant to [HRS] § 188-31" and that the current population levels of aquarium fish are sustainable. Miyasaka stated that the collection "areas are quite limited," that Hawai'i and O'ahu are the "main collecting islands," and that

Kauaʻi, Molokaʻi, and Lanaʻi "have essentially no contribution to the statewide totals and may be considered unfished." On the island of Hawaiʻi, Miyasaka continued, "35% of the 90-mile Kona coast is closed to aquarium collecting." However, Miyasaka stated that, although the 90-mile Kona coast "represent[s] approximately 12.6% of the total coastline of the state, [it] accounted for 68% of the statewide total catch numbers" in 2011. Miyasaka averred that the top ten areas where aquarium collection is conducted "account for 90% of all animals collected" and that "[t]hese top ten areas represent less than 22% of the entire coastline." As such, Miyasaka represented that "the vast majority of the State's coastline is largely unfished."

Miyasaka declared that the annual total for animals caught from 1999 to 2010 ranged from 412,587 to 1,019,720 per year, but he reasoned that "most of these numbers are from invertebrates rather than fish" (i.e., the ratio of invertebrates to fish ranges from 50% to close to 90% per year). According to Miyasaka, "this is significant because invertebrates generally reproduce faster than fish and therefore can replenish themselves faster." However, Miyasaka neither addressed nor referenced Petitioners' contentions that were based on excerpts of The Report to the Twenty-Fifth Legislature and Hawaii's State of the Reef, both of which were published by

17

DLNR.  See supra notes 4 & 5.  These publications stated that aquarium collection permits allow the collection of species that are particularly vulnerable to depletion and recognized the detrimental effects of removal of reef fish on the coral reef ecosystem.

The Report to the Twenty-Fifth Legislature, on which Petitioners relied as part of their summary judgment motion, also addressed the issues surrounding the collection of invertebrates for aquarium purposes.  The Report stated that researchers studying the Florida marine aquarium fishery had found that "the once small ornamental fish fishery has grown dramatically in recent years to become a large scale invertebrate-dominated industry."  The researchers noted that the focus of aquarium collection shifted from "purely ornamental species to ones providing biological services in home aquaria," such as "[i]nvertebrate grazers [that] can control algal growth."  The researchers concluded that "the intensive collecting of such species was ecologically unsound."

Miyasaka also described the process used in aquarium collection:

> Typically each animal is hand caught.  The collector sets [the] net, guides the fish into the net, then hand scoops the fish off the net.  Each fish is carefully selected for its condition (no damage to fins or body), size, and species.  Fish that are damaged or imperfect are returned to the ocean.  Any fish that is not the right size, color, or species is not taken.  Little or no unwanted fish are taken so there is little or no bycatch (a fish that is taken unintentionally).  This attention to detail is why

18

the marine life in the Hawaiian aquarium fishery is considered one of the highest quality products in the world.

In their reply to DLNR's opposition, Petitioners argued that aquarium collection is an "action" and that aquarium collection permit applications require DLNR's "approval," i.e., discretionary consent. In addition, Petitioners challenged DLNR's assertion that aquarium collection was being conducted in a sustainable and environmentally sound manner, stating that this assertion is not based on anything other than Miyasaka's conclusory declaration. Thus, Petitioners concluded that HEPA applies to aquarium collection under permits issued by DLNR.

After a hearing on the respective parties' motions for summary judgment, the circuit court granted DLNR's motion for summary judgment and denied Petitioners' cross motion for summary judgment, reasoning that there is no applicant "action" that triggers HEPA in this case. The circuit court stated that environmental review under HEPA is required only if there is an "action," i.e., a "program" or "project." Because "program" and "project" are not statutorily defined under HEPA, the circuit court, relying on a generally accepted dictionary, defined "program" "as a 'plan or system under which action may be taken toward a goal.'" The circuit court defined "project" "as 'a

specific plan or design; scheme' or a 'planned undertaking.'" [15] Because aquarium collection, according to the circuit court, is not a "specifically identifiable program[] or project[]," the court determined "that as a matter of law, 'aquarium collection' is not an applicant 'action' that triggers HEPA." The circuit court entered its final judgment on June 24, 2013.

## II. ICA PROCEEDINGS

Petitioners appealed from the order denying their cross motion for summary judgment, the order granting DLNR's motion for summary judgment, and the circuit court's final judgment. In its published opinion, the Intermediate Court of Appeals (ICA) outlined the steps for evaluating whether an action is subject to environmental review. Preliminarily, there must be a "program or project to be initiated by an agency or applicant." Umberger v. Dep't of Land & Nat. Res., 138 Hawai'i 508, 512, 382 P.3d 320, 324 (App. 2016) (quoting HRS § 343-2 (2010)). In addition, the program or project must (1) be initiated by an agency or a private party and require government approval; (2) qualify under one or more of the nine categories of land uses and administrative acts enumerated in HRS § 343-

---

[15]    The circuit court relied on Merriam-Webster's definition of "program" and "project." See Program, Merriam-Webster, http://www.merriam-webster.com/dictionary/program (last visited July 13, 2017); Project, Merriam-Webster, http://www.merriam-webster.com/dictionary/program (last visited July 13, 2017).

5(a) (2010); and (3) not be exempt under HRS § 343-6(a)(2) (2010). Id. at 512—13, 382 P.3d at 324—25.

The ICA characterized the "action" in this case as "the 'taking of marine or freshwater nongame fish and other aquatic life for aquarium purposes,' that is initiated by an applicant's request for an aquarium fish permit." Id. at 513, 382 P.3d at 325 (quoting HRS § 188-31(a) (2011)). The ICA emphasized that while the "[a]ppellants described the alleged action as the 'directed, intentional, large-scale commercial removal under each [p]ermit, and collectively under the dozens of such [p]ermits DLNR issued,'" they sought "an interpretation of HEPA that would apply equally to both recreational and commercial aquarium fish permits." Id. at 513-14, 382 P.3d at 325-26.

The statutory analysis of the ICA commenced with an examination of the meaning of "action." While HEPA defines "action" as "any program or project to be initiated by an agency or applicant," the ICA acknowledged that HEPA does not define "program" and "project." Id. at 514, 382 P.3d at 326 (quoting HRS § 343-2). The ICA discussed various decisions issued by the appellate courts of Hawai'i that held there was an "action" under HEPA such that the environmental review process was triggered. Those cases involved "[t]he Napilihau Villages, Mahukona Lodge, Koa Ridge project, harbor improvements for the Superferry

Project, Laumaka subdivision, and a research program concerning genetically modified algae." Id. at 516, 382 P.3d at 328. In these cases, the ICA observed that there were "specifically identifiable programs or projects." Id. According to the ICA, aquarium collection is unlike any of the activities that this court has previously considered as programs or projects for the purposes of HEPA. Id. In concluding that aquarium collection is not a "specifically identifiable program or project," the ICA emphasized that aquarium collection "includes a parent netting one or two fish from a stream for his or her child's fish tank, as well as larger scale commercial operations." Id.

In addition, the ICA reasoned that HEPA review is not the sole mechanism through which marine life and reef ecosystem could be protected from unconstrained removal in large numbers. The ICA highlighted other statutory frameworks and administrative rules that allow DLNR to manage aquatic life and resources, including catch limits and restrictions for certain species applicable to commercial aquarium collection permit holders and DLNR's authority to attach conditions to commercial marine licenses and permits. Id.

Further, the ICA noted that DLNR issues permits and licenses for activities similar to aquarium collection--e.g., bait fish licenses, freshwater game fish licenses, hunting licenses, camping permits, etc. According to the ICA, there is

"no rational distinction or logical reason why HEPA environmental review procedures should be required for aquarium fish permits, but not for these other types of licenses and permits." Id. Thus, the ICA concluded that aquarium collection under permits issued pursuant to HRS § 188-31 does not qualify as a HEPA "action." Id. at 517, 382 P.3d at 329.

The ICA, however, rejected DLNR's argument "that, even if aquarium collection fell within the definition of an 'applicant action,' it is not subject to HEPA because there is no discretionary agency approval of aquarium fish permits." Id. at 517-18, 382 P.3d at 329-30. The ICA determined that the fact that the application for an aquarium fish permit is online and completely automatic does not equate to DLNR lacking discretion because the plain language of HRS § 188-31, as supported by its legislative history, explicitly confers discretion on DLNR in deciding whether to approve an application. Id. at 518, 382 P.3d at 330. The ICA also reasoned that the online application "is simply the means by which DLNR has determined to exercise its discretion." Id. Thus, the ICA affirmed the circuit court's judgment that granted DLNR's motion for summary judgment and denied Petitioners' cross motion for summary judgment. Id.

### III. ARGUMENTS ON CERTIORARI

In their application for writ of certiorari, Petitioners advance four contentions: (1) the legislature

23

intended the words "program" and "project" to encompass a broad scope of human activity, including aquarium collection; (2) HEPA applies to individuals and provides mechanisms to resolve practical difficulties that may be encountered during the environmental review process[16]; (3) the ICA's construction of "program or project" undermines DLNR's public trust and statutory duties to conserve Hawaii's marine resources; and (4) other regulatory tools that DLNR possesses are not substitutes for HEPA, nor do such tools excuse violations of HEPA.

In its response, DLNR contends that (1) the ICA was correct in concluding that aquarium collection is not an "action" within the meaning of HEPA; (2) the environment is not harmed by the present system and any harm to the environment is irrelevant to the analysis; (3) Petitioners' argument regarding public trust was never pleaded and, in any event, does not assist this court in construing HRS chapter 343; and (4) the ICA erred in holding that the issuance of aquarium collection permits requires DLNR's discretionary consent.

_____

[16] Petitioners argue that the ICA's concern about one-fish recreational aquarium collection is unjustified because that activity may be exempted from HEPA pursuant to HRS § 343-6(a)(2) (2010) as it may fall within one of DLNR's exempt categories--minor alteration in the conditions of land, water, or vegetation. Petitioners also assert that "tiering," which allows an agency to incorporate previous environmental assessments and impact statements or to group similar actions in a single environmental assessment or impact statement, would address the ICA's apparent concern about the burden on small-time aquarium collectors of complying with HEPA's requirements.

## IV. STANDARDS OF REVIEW

A trial court's ruling on a motion for summary judgment is reviewed de novo under the right/wrong standard. Salera v. Caldwell, 137 Hawai'i 409, 415, 375 P.3d 188, 194 (2016). "The interpretation of a statute is a question of law reviewable de novo." Kauai Springs, Inc. v. Planning Comm'n of Cty. of Kaua'i, 133 Hawai'i 141, 163, 324 P.3d 951, 973 (2014) (quoting Franks v. City & Cty. of Honolulu, 74 Haw. 328, 334, 843 P.2d 668, 671 (1993)).

## V. DISCUSSION

The central question in this case is whether aquarium collection pursuant to permits issued under HRS § 188-31 (2011) and DLNR's administrative rules is subject to the environmental review provisions of HEPA. An environmental assessment under HEPA is required if three conditions are satisfied: (1) the proposed activity is an "action" under HRS § 343-2 (2010); (2) the action proposes one or more of the nine categories of land uses or administrative acts enumerated in HRS § 343-5(a) (2010); and (3) the action is not declared exempt pursuant to HRS § 343-6(a)(2) (2010). See Sierra Club v. Dep't of Transp. of the State of Haw., 115 Hawai'i 299, 306, 167 P.3d 292, 299 (2007). In cases where the proposed action is initiated by a private party for approval by a government agency, an additional

25

requirement is that the agency exercises discretionary consent in the approval process. HRS § 343-5(e) (Supp. 2012). The circuit court granted DLNR's summary judgment motion and denied Petitioners' cross motion for summary judgment on the grounds that aquarium collection under HRS § 188-31 is not a HEPA "action." Thus, if there is a genuine issue of material fact as to whether aquarium collection is a HEPA "action," then summary judgment in favor of DLNR on this basis was erroneous. If, on the other hand, there is no genuine issue of material fact that aquarium collection under HRS § 188-31 and the DLNR administrative scheme is a HEPA "action," that it falls within one of the categories of land uses or administrative actions set forth in HRS § 343-5(a), that it is not exempt from HEPA, and that the issuance of a permit requires DLNR's exercise of discretionary consent, then the circuit court erred in denying Petitioners' cross motion for summary judgment.

## A. Whether Issuance of a Permit for Aquarium Collection is a HEPA "Action"

### 1. The Plain-Language Construction of "Action" under HRS § 343-2

To determine whether aquarium collection is a HEPA "action," we begin by interpreting HRS § 343-2, which sets forth the statutory definition of "action." HEPA defines "action" as "any program or project to be initiated by any agency or

applicant."[17]  HRS § 343-2.  "Program" and "project" are not defined terms under HEPA.  As such, "this court may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning" of those words.  State v. Guyton, 135 Hawai'i 372, 378, 351 P.3d 1138, 1144 (2015) (quoting State v. Pali, 129 Hawai'i 363, 370, 300 P.3d 1022, 1029 (2013)).  "Program" is generally defined as "a plan or system under which action may be taken toward a goal."[18]  "Project" is defined as "a specific plan or design" or "a planned undertaking."[19]

In determining whether aquarium collection is a program or project, the crucial first step is properly defining the activity authorized by aquarium collection permits issued by DLNR.  See Sierra Club, 115 Hawai'i at 306 n.6, 167 P.3d at 299 n.6 ("An important preliminary step in assessing whether an 'action' is subject to environmental review is defining the action itself.").  HRS § 188-31(a) provides that

---

[17]     It follows from this definition that there are two types of HEPA "actions": agency actions and applicant actions.  Sierra Club, 115 Hawai'i at 306, 167 P.3d at 299.  The parties' position in this case is that aquarium collection under HRS § 188-31 constitutes an applicant action and not an agency action.  An applicant action is initiated "by a private party who requires government approvals for the project to proceed."  Id.

[18]     Program, Merriam-Webster, https://www.merriam-webster.com/dictionary/program (last visited July 14, 2017).

[19]     Project, Merriam-Webster, https://www.merriam-webster.com/dictionary/project (last visited July 14, 2017).

> [e]xcept as prohibited by law, the department, upon receipt of a written application, may issue an aquarium fish permit, not longer than one year in duration, to use fine meshed traps, or fine meshed nets other than throw nets, for the taking of marine or freshwater nongame fish and other aquatic life for aquarium purposes.[20]

This statutory subsection, together with DLNR's administrative rules, allows permit applicants to engage in two general types of activities: recreational aquarium collection and commercial aquarium collection.

Recreational aquarium collection permits--those "issued . . . for non-commercial use," Hawaii Administrative Rules (HAR) § 13-77-2 (effective 2015)--allow the extraction of up to "five fish or aquatic life specimens per person per day," HAR § 13-75-14 (effective 2007).  Thus, each recreational permit authorizes the collection of up to 1,825 fish or other aquatic life within a one-year period.  Id.  In the case of commercial aquarium collection permits, which is intended for issuance to persons who collect "for profit or gain or as a means of livelihood," HAR § 13-74-1 (effective 2010), DLNR has not promulgated any rules that establish limits on the total number of fish and other aquatic life that commercial collectors may extract for the entire period in which the permits are

---

[20] Although permits issued under HRS § 188-31 are valid for no longer than one year, DLNR allows such permits to be renewed instead of requiring holders of expired permits to reapply.  See Licenses & Permits, State of Haw. Division of Aquatic Resources, http://dlnr.hawaii.gov/dar/licenses-permits/ (last visited July 24, 2017).

effective. See HAR § 13-75-14 (providing a total catch limit only for recreational collection).[21]

HRS § 188-31 also clearly delineates the aquarium collection practices that must be complied with to obtain a permit when aquarium collectors are allowed to use fine meshed traps or nets to take fish and other aquatic life for aquarium purposes. Subsection (b) of HRS § 188-31 states that, "[e]xcept as prohibited by law, the permits shall be issued only to persons who can satisfy the department that they possess facilities to and can maintain fish and other aquatic life alive and in reasonable health." HRS § 188-31(b).

The extraction of fish or other aquatic life under aquarium collection permits is also limited to "aquarium purposes," HRS § 188-31(c), which, per the statute, "means to hold salt water fish, freshwater nongame fish, or other aquatic life alive in a state of captivity as pets, for scientific

---

[21] A few statutes and regulations restrict or limit the manner and extent to which aquarium collection may be conducted: bag and size limits for certain aquatic species on Oʻahu (see HAR § 13-77-6(b), (c), (d) (effective 2015)) and in West Hawaiʻi (see HAR § 13-60.4-4 (effective 2013)), length and height requirements for allowed mesh nets that apply to Oʻahu (see HAR § 13-77-6(a)), monthly reporting requirements for commercial collectors (see HRS §§ 189-3 (2011), 189-3.5 (2011); HAR § 13-74-20(d) (effective 2010)), and DLNR's power pursuant to HAR § 13-75-14(4) (effective 2007) to attach conditions to commercial permits. Permits issued are also subject to terms and conditions imposed by DLNR that are generally consistent with or reference the statutes and rules that relate to aquarium collection.

study, or for public exhibition or display, or for sale for these purposes," HRS § 188-31(d)(1).

Based on the language of HRS § 188-31, the framework it establishes, and the administrative rules that DLNR promulgated pursuant to HRS § 188-31, the defined activity authorized under an aquarium collection permit is as follows:

(1) the extraction annually from State waters of an unlimited number of fish or other aquatic life for profit or other gains (in the case of commercial aquarium collection) or of 1,825 fish or other aquatic life for non-commercial purposes (in the case of recreational aquarium collection), subject to the terms and conditions of the permit and restrictions set by law;

(2) through the use of fine meshed nets or traps;

(3) by individuals who can satisfy DLNR that they possess facilities that can maintain aquatic life alive and in reasonable health; and

(4) for the purpose of holding aquatic life alive in a state of captivity as pets, for scientific study, or for public exhibition or display, or for sale for these purposes.

The course and scope of conduct allowed by both recreational and commercial aquarium collection permits issued under HRS § 188-31 and DLNR's administrative scheme encompass

activity that qualifies as a "program" or "project." The activity is a "specific plan" or "a planned undertaking"--and, therefore, a "project"--because it involves the systematic and deliberate extraction of aquatic life using procedures, equipment, facilities, and techniques authorized or required by HRS § 188-31 and related administrative rules for the specific purpose of holding captive such aquatic life for aquarium purposes in order to earn profit (in the case of commercial permit holders) or for non-commercial use (in the case of recreational permit holders).

In the same vein, both recreational and commercial aquarium collection are "programs" within the plain meaning of that word: the "plan or system under which action may be taken" is the purposeful and methodical extraction of aquatic life from State waters through the use of fine meshed nets and traps and the transfer of such aquatic life to facilities that are capable of keeping the collected aquatic life alive. The "desired goal" is to take aquatic life from its habitat and hold it in a state of captivity for aquarium purposes, as defined by HRS § 188-31(d)(1), in order to earn profits (in the case of commercial permit holders) or for non-commercial use (in the case of recreational permit holders). Additionally, the method by which extraction is accomplished involves instruments and techniques

that enhance the efficiency and amount of the collection.[22]

Accordingly, aquarium collection conducted under permits issued

pursuant to HRS § 188-31 and DLNR's administrative rules is a

"program or project" and therefore constitutes a HEPA "action."

## 2. HEPA's Purpose and Structure Support the Plain-Language Construction of the Word "Action"

Our interpretation of "action," together with our

conclusion that aquarium collection under HRS § 188-31 and

DLNR's administrative rules constitutes a HEPA "action," is

confirmed by the purpose of HEPA, as explained in HRS § 343-1

(2010), and by HEPA's framework. See State v. Bovee, 139 Hawai'i

530, 544 n.13, 394 P.3d 760, 774 n.13 (2017) (explaining that

laws in pari materia--those dealing with the same subject

matter--shall be construed with reference to each other); State

v. Alangcas, 134 Hawai'i 515, 526, 345 P.3d 181, 192 (2015)

(stating that legislative history is relevant in statutory

construction even when the language appears clear because it

ensures that the literal interpretation is consonant with the

---

[22]    The declarations that Petitioners submitted, describing several aquarium collection practices that holders of permits employ, firmly support the conclusion that aquarium collection under HRS § 188-31 is both a "program" and "project": sophisticated and advanced techniques--such as the use of scuba technology, underwater jet propulsion systems, nitrox tanks, fizzing, underwater blankets, etc.--are utilized to extract aquatic life from State waters for aquarium purposes.  These averments illustrate how elaborate, methodical, and systematic aquarium collection under HRS § 188-31 is practiced in order to achieve the ultimate purpose of holding captive aquatic life for specific, statutorily enumerated purposes.

underlying policy that the legislature sought to implement through the statute, thereby avoiding an absurd or unjust result).

It has been frequently stated that "HEPA's purpose is 'to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations.'" Nuuanu Valley Ass'n v. City & Cty. of Honolulu, 119 Hawai'i 90, 103, 194 P.3d 531, 544 (2008) (quoting HRS § 343-1). The Hawai'i Legislature enacted HEPA after finding "that an environmental review process will integrate the review of environmental concerns with existing planning processes of the State and counties and alert decision makers to significant environmental effects which may result from the implementation of certain actions." HRS § 343-1. The legislature also found "that the process of reviewing environmental effects is desirable because environmental consciousness is enhanced, cooperation and coordination are encouraged, and public participation during the review process benefits all parties involved and society as a whole." Id. Environmental impact statements also "allow decision-makers to make informed decisions" when confronted by certain proposed actions. H. Stand. Comm. Rep. No. 521, in 2005 House Journal, at 1242.

33

The purpose of HEPA and the legislature's intent in enacting HEPA indicate that it was not meant to be applied only to a narrow set of activities.  See generally Pearl Ridge Estates Cmty. Ass'n v. Lear Siegler, Inc., 65 Haw. 133, 140-41, 648 P.2d 702, 707 (1982) (noting that HEPA's scope is wider "than the federal or the typical state analogue" (quoting Molokai Homesteaders Coop. Ass'n v. Cobb, 63 Haw. 453, 465, 629 P.2d 1134, 1143 (1981))).  This determination is supported by the wide range of activities and courses of conduct to which HEPA has been applied, including construction of buildings, expansion of or modifications to preexisting buildings, development of residential communities, and other real estate developments;[23] construction on government lands in order to build or connect to sewage lines, waterlines, or other infrastructure;[24] development of public transportation;[25]

---

[23]    See Unite Here! Local 5 v. City & Cty. of Honolulu, 123 Hawai'i 150, 155, 231 P.3d 423, 428 (2010) (expansion of the Turtle Bay resort, including the addition of hotel and condominium units and infrastructure); Nuuanu Valley Ass'n, 119 Hawai'i at 94, 194 P.3d at 535 (development of a subdivision consisting of nine residential lots); Price v. Obayashi Haw. Corp., 81 Hawai'i 171, 173, 914 P.2d 1364, 1366 (1996) (recreational development project on the North Shore of O'ahu); Kahana Sunset Owners Ass'n v. Cty. of Maui, 86 Hawai'i 66, 68, 947 P.2d 378, 380 (1997) (multi-family residential development on Maui); Waikiki Resort Hotel, Inc. v. City & Cty. of Honolulu, 63 Haw. 222, 224, 624 P.2d 1353, 1356-57 (1981) (construction of a hotel building in Waikīkī); Hewitt v. Waikiki Shopping Plaza, 6 Haw. App. 387, 390, 722 P.2d 1055, 1057 (1986) (construction of a shopping and parking complex in Waikīkī).

[24]    See Sierra Club v. Office of Planning, State of Haw., 109 Hawai'i 411, 413, 126 P.3d 1098, 1100 (2006) (tunneling underneath several state highways in order to construct a sewage transmission line and a water

(continued . . .)

construction of power generating facilities and the drilling of exploratory geothermal wells;[26] the growing of imported algae on facilities in state lands;[27] and the Management Plan of the Observatory Site on the summit of Haleakalā in which a new solar telescope was under construction.[28]  The commonality among the varied activities to which HEPA has been applied is their potential of producing "environmental concerns" that HEPA intended to be "given appropriate consideration in decision making along with economic and technical considerations."  See Nuuanu Valley Ass'n, 119 Hawai'i at 103, 194 P.3d at 544 (quoting

_____

(continued . . .)

transmission line); Citizens for Prot. of N. Kohala Coastline v. Cty. of Haw., 91 Hawai'i 94, 103, 979 P.2d 1120, 1129 (1999) (construction of underpasses below a state highway for golf carts); McGlone v. Inaba, 64 Haw. 27, 29, 636 P.2d 158, 160-61 (1981) (construction of underground utilities on state conservation land); Molokai Homesteaders Coop. Ass'n, 63 Haw. at 455, 629 P.2d at 1137 (use of transmission facilities of the Molokai Irrigation System to transport water to a resort complex on the west end of Moloka'i); Life of the Land v. Ariyoshi, 59 Haw. 156, 157-67, 577 P.2d 1116, 1117 (1978) (construction of the Central Maui Water Transmission System).

[25]     See Sierra Club, 115 Hawai'i at 305, 167 P.3d at 298 (proposed developments to the Kahului Harbor in order to accommodate the operations of the Hawai'i Superferry project).

[26]     Kepo'o v. Kane, 106 Hawai'i 270, 275, 103 P.3d 939, 944 (2005) (power generating facility); Medeiros v. Haw. Cty. Planning Comm'n, 8 Haw. App. 183, 186, 797 P.2d 59, 61 (1990) (drilling of four exploratory geothermal wells); Waianae Coast Neighborhood Bd. v. Hawaiian Elec. Co., 64 Haw. 126, 127, 637 P.2d 776, 777 (1981) (addition of an electric generating plant on O'ahu).

[27]     'Ohana Pale Ke Ao v. Bd. of Agric., State of Haw., 118 Hawai'i 247, 254, 188 P.3d 761, 768 (App. 2008).

[28]     Kilakila 'O Haleakala v. Univ. of Hawai'i, 138 Hawai'i 364, 371, 382 P.3d 176, 183 (2016).

HRS § 343-1). The diversity of the subject matter of previous HEPA cases affirms that the word "action" has not been (and should not be) narrowly construed. In this light, our determination that aquarium collection is a HEPA "action" furthers HEPA's purpose as stated under HRS § 188-31: it "will ensure that environmental concerns are given appropriate consideration in decision making" so as to foster a holistic and thoughtful decisional process. HRS § 343-1. Given the nature, magnitude, and scale of aquarium collection under HRS § 188-31 and DLNR's administrative rules, any environmental effects that aquarium collection may have fall squarely within the ambit of what HEPA's environmental review framework intends to integrate into governmental decision making.[29]

Lastly, our interpretation of "action" and our conclusion that it includes aquarium collection pursuant to permits issued under HRS § 188-31 and DLNR's administrative rules are also supported by HEPA's framework. As discussed, the fact that a proposed activity qualifies as an "action" does not mean that it would require environmental review, since the activity must also fall within a statutory category listed in HRS § 343-5(a) and not be exempt from HEPA. See Sierra Club,

---

[29] Compare the challenged activities in previous HEPA cases, supra notes 23–28.

115 Hawai'i at 306, 167 P.3d at 299. And for applicant actions, as in this case, the agency must exercise discretionary consent as to the proposed activity in order for the activity to be subject to HEPA. See infra Part V.D. Thus, our interpretation of "action," which would include a range of activities that has the potential of producing environmental effects, is supported by the HEPA framework because other steps in the HEPA analysis serve to counterbalance the scope of the meaning of "action." That is, the succeeding steps in the HEPA analysis filter activities that qualify as "actions" in order to determine which "actions" actually require environmental review.

### 3. The ICA Erred in its Analysis

The ICA, in the course of conducting a plain-language interpretation of HEPA "action," noted that the circuit court used a well-accepted dictionary to define "program" and "project." Umberger v. Dep't of Land & Nat. Res., 138 Hawai'i 508, 514, 382 P.3d 320, 326 (App. 2016). The ICA concluded that aquarium collection under HRS § 188-31 is not a HEPA "action" because (1) none of the other cases decided by Hawai'i appellate courts involved activity similar to aquarium collection; (2) a permit might include a situation in which a parent collects one or two fish or other aquatic life for use in a home aquarium; (3) other statutes and administrative rules exist that

37

sufficiently regulate aquarium collection; and (4) other permitting regimes would be subject to HEPA environmental review if aquarium collection under HRS § 188-31 were considered an "action."  Id. at 515—17, 382 P.3d at 327—29.

With respect to the ICA's first line of reasoning, it concluded that aquarium collection is not a HEPA "action" because, compared to any of the activities involved in previous HEPA cases, it is not a "specifically identifiable program or project."  Id. at 516, 382 P.3d at 328.  However, as discussed, the class of activities and courses of action that HEPA covers is broad so as to successfully effectuate the intent and purpose of the statutory scheme.  See supra notes 23—28.  Additionally, there has been no HEPA case in which this court determined whether an activity is a HEPA "action" by evaluating its similarity to the challenged activities in other HEPA cases. Doing so would unreasonably delimit HEPA's application in a manner inconsistent with its purpose.[30]

The ICA's second line of reasoning is that it would be "unprecedented" to apply HEPA to the hypothetical situation in

---

[30]     Further, if the similarity of aquarium collection to a previous activity to which HEPA was applied is a relevant consideration on whether aquarium collection is an "action," then aquarium collection qualifies as an "action" because it is similar to Disney Aulani's request for a permit to use small mesh nets to collect live marine life for stocking a saltwater swimming pool.  Under the ICA's analysis, just as Disney Aulani's proposed activity was deemed to be a HEPA "action," so would aquarium collection under permits issued pursuant to HRS § 188-31 and DLNR's administrative rules.

which a "parent net[s] one or two fish from a stream for his or her child's fish tank." Umberger, 138 Hawai'i at 516, 382 P.3d at 328. The premise of this line of reasoning is that, even though recreational aquarium collection permits authorize the extraction of almost 2,000 fish or other aquatic life per person annually, for the purpose of determining whether HEPA applies, the focus should be on the possibility that a person would use his or her recreational aquarium collection permit to take only one or two fish.

This analysis is flawed because the properly defined activity for the purposes of the HEPA analysis must encompass the outer limits of what the permits allow and not only the most restrictive hypothetical manner in which the permits may be used. That is, as discussed, the analysis must proceed from the properly defined activity allowed under aquarium collection permits, see supra Part V.A. (defining the activity authorized under HRS § 188-31 and DLNR's related administrative rules). See Sierra Club, 115 Hawai'i at 306 n.6, 167 P.3d at 299 n.6.

In addition, a parent netting one or two fish for a home aquarium may not even be within the ambit of HRS § 188-31 because aquarium collection permits are required only if the applicant intends "to use fine meshed traps, or fine meshed nets other than throw nets, for the taking of marine or freshwater nongame fish and other aquatic life for aquarium purposes." HRS

§ 188-31(a). DLNR expounds on this distinction on its own website, informing the public that a permit to collect fish and other aquatic life for a home aquarium is not required "if a) the net has large mesh (more than two inches mesh); b) the net has small mesh but is less than three feet in length, height, or width, including the handle; or c) using a slurp gun." FAQ's, State of Haw. Division of Aquatic Resources, http://dlnr.hawaii.gov/dar/fishing/faqs/ (last visited July 11, 2017). Under these circumstances, the act of netting one or two fish would not constitute aquarium collection under HRS § 188-31 and, consequently, would not be a HEPA "action."[31] Lastly, the situation postulated by the ICA--a parent netting one or two fish or other aquatic life for recreational purposes--is not present in this case,[32] and DLNR's own evidence in fact showed that, from 1999 to 2010, millions of aquatic life were harvested under aquarium collection permits issued pursuant to HRS § 188-31.

---

[31] In addition, a parent collecting one or two fish for recreational purposes would not fall within any of the categories of land uses and administrative acts under HRS § 343-5(a), see infra Part V.B. & note 47, and even if it were to qualify under any of the categories under HRS § 343-5(a), a parent engaging in aquarium collection of this nature may also be exempt from HEPA, see infra Part V.C. & note 51.

[32] Petitioners also emphasize in their application for writ of certiorari that this scenario is not part of the record in this case.

In holding that aquarium collection does not constitute a HEPA "action," the ICA also reasoned that there is a "panoply of other regulatory tools that are in place" "to protect marine life and the reef ecosystem from the 'unconstrained removal' of large numbers of aquarium fish." Umberger, 138 Hawai'i at 516, 382 P.3d at 329. The regulations that the ICA identified include bag and size limits for certain aquatic species on O'ahu (see HAR § 13-77-6(b), (c), (d) (effective 2015)), length and height requirements for allowed mesh nets that apply to O'ahu (see HAR § 13-77-6(a)), monthly reporting requirements for commercial collectors (see HRS §§ 189-3 (2011), 189-3.5 (2011); HAR § 13-74-20(d) (effective 2010)), and DLNR's power pursuant to HAR § 13-75-14(4) (effective 2007) to attach other conditions to commercial permits. Umberger, 138 Hawai'i at 516-17, 382 P.3d at 328-29.[33] However, as the ICA itself acknowledged, these regulations and statutory frameworks are not "dispositive" of whether aquarium collection pursuant to HRS § 188-31 and DLNR's administrative rules is a HEPA action. Id. at 517, 382 P.3d at 329. Further,

---

[33] The ICA also referenced statutory provisions governing Marine Life Conservation Districts, Regional Fisheries Management Areas (including Fish Replenishment Areas), Shoreline Fisheries Management Areas (including Marine Protection Areas), and Marine Refuges. Umberger, 138 Hawai'i at 516-17, 382 P.3d at 328-29.

none of these regulations and statutes defines or modifies aquarium collection pursuant to HRS § 188-31 and DLNR's administrative rules in a manner that would exclude such collection from the meaning of "action" under HEPA.[34]

The ICA's reasoning that other statutes and rules that overlap with HEPA could somehow place certain activities outside of the meaning of "action" or preclude the application of HEPA to such activities is also contradicted by its own precedent. As the ICA itself recognized in 'Ohana Pale Ke Ao, where HEPA overlaps and is consistent with another chapter of the HRS, both would be given effect. 'Ohana Pale Ke Ao v. Bd. of Agric., State of Haw., 118 Hawai'i 247, 255, 188 P.3d 761, 769 (App. 2008). Here, there is no hindrance to giving effect to the statutes and

---

[34] The ICA's suggestion that the number or comprehensiveness of agency rules plays a significant role in determining whether an activity qualifies as a HEPA "action" generates numerous evaluative considerations and other complications. For example, there is no standard for deciding whether a statutory or regulatory scheme is sufficiently comprehensive, protective, and enforced as to render a regulated activity not a HEPA "action." In addition, the existence of other statutes and rules concerning a particular activity does not necessarily mean that their purpose would be identical to that of HEPA or that they, in fact, are sufficiently protective. In this case, for example, despite the statutes and rules that the ICA underscored in its opinion, excerpts of publications that Petitioners submitted in support of their motion for summary judgment illustrate the detrimental effects of aquarium collection to fish population and coral reef ecosystems.

Further, the feasibility of the ICA's analysis is also predicated on the assumption that any comprehensive statutory or regulatory scheme in place is strictly enforced. However, there is no evidence in the record that could support this assumption. Petitioner Willie Kaupiko declared that some aquarium collectors fish in prohibited areas, that he reported the incidents to DLNR, that DLNR is non-responsive or slow to respond, and that DLNR did not investigate the allegations.

regulations identified by the ICA while also applying the requirements of HEPA to aquarium collection because the statutes and regulations have not been demonstrated to be inconsistent with HEPA.  See id.[35]

Further, as mentioned, HEPA's purpose is "to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations."  HRS § 343-1.  If the fact that other laws and rules that facially appear to bear upon the environmental effects of an activity would exclude the activity from HEPA's purview, then this would frustrate HEPA's purpose of requiring agencies to appropriately consider environmental concerns in their decision-making process.  In other words, under the ICA's analysis, an agency would be able to bypass the protections provided through HEPA by promulgating administrative rules that appear to address or bear upon the possible environmental effects of an activity that the agency regulates without actually engaging in the informed and deliberate decision-making process that HEPA requires.

---

[35]    No evidence was presented to demonstrate any inconsistency between HEPA, on the one hand, and the statutes and rules that the ICA referenced in its opinion, on the other.  DLNR does not argue (nor has it argued in the lower courts) that such an inconsistency exists.

The ICA's final reason for its holding that aquarium collection under HRS § 188-31 is not a HEPA "action" is that Petitioners "offered no rational distinction or logical reason why HEPA environmental review procedures should be required for aquarium fish permits, but not for . . . other types of licenses and permits," including (among others) bait fish licenses, commercial marine licenses, special activity permits, permits to enter or conduct activities in certain areas, hunting licenses, camping permits, collecting permits, and commercial activity permits. Umberger, 138 Hawai'i at 517, 382 P.3d at 329. Implicit in the ICA's reasoning is the concern that, if aquarium collection under HRS § 188-31 were considered a HEPA "action" subject to environmental review, other permitting regimes administered by government agencies would also be subject to environmental review. See id. However, the fact that aquarium collection is conducted pursuant to the permitting scheme that DLNR administers does not drive the conclusion that aquarium collection is a HEPA "action" or that HEPA applies. The activities authorized by the permitting schemes that the ICA utilized in its analysis are not effective points of comparison given their substantial differences, both in magnitude and nature, from the activities sanctioned by aquarium collection permits. For example, many of the activities under the

permitting regimes that the ICA identified do not appear to be "programs" or "projects."

Further, as stated, in order for HEPA to apply, the activity must be an action that falls within a category enumerated in HRS § 343-5(a), discussed infra Part V.B., and not be exempt, discussed infra Part V.C. See Sierra Club, 115 Hawai'i at 306, 167 P.3d at 299. And for applicant actions, an additional prerequisite is that the action must be subject to an agency's exercise of discretionary consent, discussed infra Part V.D. Thus, concluding that aquarium collection under HRS § 188-31 and DLNR's administrative rules is a HEPA "action" or is subject to HEPA does not necessarily prescribe a determination that activities under other permitting regimes are also HEPA "actions" or are subject to HEPA's environmental review requirements. Such activities must independently meet the analytical framework set forth in Sierra Club and discussed in this case.

Based on the foregoing, the ICA's analysis did not proceed from a full and proper definition of the activity authorized under aquarium collection permits. Instead, the ICA appeared to focus on an extreme hypothetical subset of the activity being proposed. In addition, the ICA improperly relied on other statutes, administrative rules, and other permitting

45

regimes in its analysis.  For these reasons, the ICA erred in concluding that aquarium collection is not a HEPA "action."[36]

## B. Whether Aquarium Collection Falls Within One or More of the Nine Categories Listed Under HRS § 343-5(a)

For an activity to be subject to HEPA environmental review, the second requirement is that it must fall within at least one category of land uses or administrative acts (known as "triggers") enumerated in HRS § 343-5(a) (2010).[37]  See Sierra Club v. Dep't of Transp. of the State of Haw., 115 Hawai'i 299, 306, 167 P.3d 292, 299 (2007).  DLNR conceded for the purposes of the summary judgment proceedings that "there is a use of state land" in this case and that, therefore, "[t]here is a 'trigger' pursuant to Haw. Rev. Stat. § 343-5(a) (2010)."  After

---

[36]    Petitioners also contend that the ICA's construction of "program" and "project" undermines DLNR's public trust and statutory duties to conserve marine resources.  In light of our disposition in this case, this issue need not be reached.

[37]    The parties' primary dispute in this case involves whether activities allowed under permits issued pursuant to HRS § 188-31 and DLNR's administrative rules are HEPA "actions."  Having found that aquarium collection pursuant to permits issued by DLNR is a HEPA "action"--contrary to the circuit court's ruling--we proceed to consider other grounds upon which the circuit court's grant of summary judgment to DLNR may be affirmed.  See Reyes v. Kuboyama, 76 Hawai'i 137, 140-41, 870 P.2d 1281, 1284-85 (1994) ("This court may affirm a grant of summary judgment on any ground appearing in the record, even if the circuit court did not rely on it.").  Thus, we consider whether there is an issue of material fact as to either of the two other requisites of HEPA review.

reviewing the applicable legal principles in the discussion that follows, we conclude that DLNR's concession is correct.[38]

Categories of land use under which aquarium collection may fall include HRS § 343-5(a)(1) (actions that "[p]ropose the use of state or county lands")[39] and HRS § 343-5(a)(2) (actions that "[p]ropose any use within any land classified as a conservation district by the state land use commission under chapter 205"). Therefore, we determine (1) whether marine waters[40] and the submerged lands in which aquarium collection is

---

[38]    We review the merits of DLNR's concession because a court is not bound by a party's "apparent concession of law." Ass'n of Apartment Owners of Newtown Meadows ex rel. its Bd. of Dirs. v. Venture 15, Inc., 115 Hawai'i 232, 254, 167 P.3d 225, 247 (2007) (citing McCandless v. Campbell, 20 Haw. 404, 405 (1911)). "[W]e are free to interpret . . . and apply the correct law to its enforcement." Beclar Corp. v. Young, 7 Haw. App. 183, 190, 750 P.2d 934, 938–39 (1988).

[39]    In full, HRS § 343-5(a)(1) provides as follows:

        (a) Except as otherwise provided, an environmental assessment shall be required for actions that:

        (1) Propose the use of state or county lands or the use of state or county funds, other than funds to be used for feasibility or planning studies for possible future programs or projects that the agency has not approved, adopted, or funded, or funds to be used for the acquisition of unimproved real property; provided that the agency shall consider environmental factors and available alternatives in its feasibility or planning studies; provided further that an environmental assessment for proposed uses under section 205-2(d)(11) or 205-4.5(a)(13) shall only be required pursuant to section 205-5(b) . . . .

[40]    Aquarium collection under HRS § 188-31 also allows extraction of fish and other aquatic life from freshwater sources. HRS § 188-31(a). We do not address freshwater sources because the activities under the permits being challenged in this case, based on the parties' filings and the record on appeal, all transpire in marine waters and submerged lands.

47

conducted constitute state lands or are within a conservation district and (2) whether aquarium collection constitutes "use."

### 1. Whether Marine Waters and Submerged Lands in Which Aquarium Collection is Conducted Constitute State Lands

"Land" is not defined by HEPA, so we commence our statutory construction by employing "the well-settled canon that '[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other.  What is clear in one statute may be called upon in aid to explain what is doubtful in another.'"  State v. Bovee, 139 Hawai'i 530, 544, 394 P.3d 760, 774 (2017) (quoting State v. Alangcas, 134 Hawai'i 515, 527, 345 P.3d 181, 193 (2015)); accord HRS § 1-16 (1993).  Chapter 171 of the HRS, the chapter that created DLNR and prescribes its authority,[41] defines "land" as "includ[ing] all interests therein and natural resources including water, minerals, and all such things connected with land, unless otherwise expressly provided."  HRS § 171-1 (2011) (emphasis added).  HRS § 171-2 then defines "public lands" as

> all lands or interest therein in the State classed as government or crown lands previous to August 15, 1895, or acquired or reserved by the government upon or subsequent to that date by purchase, exchange, escheat, or the exercise of the right of eminent domain, or in any other manner; including lands accreted after May 20, 2003, and not otherwise awarded, submerged lands, and lands beneath tidal waters that are suitable for reclamation, together

_____

[41]  See generally HRS §§ 171-3 (2011), 171-4 (2011), 171-6 (2011), 171-7 (2011).

> with reclaimed lands that have been given the status of
> public lands under this chapter . . . .

HRS § 171-2 (2011) (emphases added).[42]

Thus, included within the meaning of "land" and "public lands" are "water" and "submerged lands." HRS §§ 171-1, 171-2. Based on these definitions, marine waters and submerged lands in which aquarium collection is conducted are included within the meaning of "land" under HEPA. HRS §§ 171-1, 171-2.

Further, when the State acts as a trustee and exercises fiduciary duties over certain areas not typically considered "state lands," this court has held that, for HEPA purposes, those areas qualify as state lands. For example, this court held that Hawaiian homelands are "state lands" for HEPA purposes because of the State's trust obligations with respect to those lands and its fiduciary duty to the beneficiaries of those lands. Kepoʻo v. Watson, 87 Hawaiʻi 91, 97–98, 952 P.2d 379, 385–86 (1998). Similar to the State's trusteeship to Hawaiian homelands, this court has repeatedly reaffirmed that

---

[42] On the same note, DLNR's administrative rules define "[l]and" as "all real property, fast or submerged, and all interests therein, including fauna, flora, minerals, and all such natural resources, unless otherwise expressly provided." HAR § 13-5-2 (effective 1994). The Land Use Commission's rules define "[l]and" as "all real property in the State including areas under water within the boundaries of the State." HAR § 15-15-03 (effective 1997).

DLNR then defines the phrase "[s]ubmerged lands" as "lands from the shoreline seaward to the extent of the State's jurisdiction." HAR § 13-5-2.

the State's public trust obligations pursuant to article XI, section 1 of the Hawaiʻi Constitution extend "to all water resources." In re Water Use Permit Applications (Waiāhole), 94 Hawaiʻi 97, 133, 9 P.3d 409, 445 (2000); Kauai Springs, Inc. v. Planning Comm'n of the Cty. of Kauaʻi, 133 Hawaiʻi 141, 172, 324 P.3d 951, 982 (2014) ("[T]he public trust doctrine applies to all water resources without exception or distinction." (quoting Waiāhole, 94 Hawaiʻi at 133, 9 P.3d at 445)). The common law of Hawaiʻi also embodies the precept that "navigable waters" and "[t]he lands under the navigable waters in and around the territory of the Hawaiian Government are held in trust for the public uses of navigation." King v. Oahu Ry. & Land Co., 11 Haw. 717, 725 (Haw. Terr. 1899). Just as Hawaiian homelands are "state lands" for the purposes of HRS § 343-5(a)(1) because they are subject to the State's statutorily defined trust obligations, so too are marine waters and submerged lands, both of which are subject to the State's constitutional and common-law public trust duties. See Kepoʻo, 87 Hawaiʻi at 97-98, 952 P.2d at 385-86; Waiāhole, 94 Hawaiʻi at 133, 9 P.3d at 445. It therefore follows that the State marine waters and the submerged lands in which aquarium collection occurs are "state lands" under HEPA.

**2. Whether Marine Waters are Within a Conservation District**

HEPA environmental review is also triggered when an action "[p]ropose[s] any use within any land classified as a conservation district by the state land use commission under chapter 205." HRS § 343-5(a)(2). According to HRS § 205-2(e) (Supp. 2012), "[c]onservation districts shall include areas necessary for . . . conserving indigenous or endemic . . . fish[] and wildlife, including those which are threatened or endangered," or "would maintain or enhance the conservation of natural or scenic resources." Thus, the legislature uses the term "areas" in defining "conservation districts," and it does not limit what constitutes "conservation districts" to "lands." Id.[43]

Additionally, pursuant to HRS § 343-5(a)(2), the Land Use Commission has adopted HAR § 15-15-20, which provides in relevant part the following:

> §15-15-20  Standards for determining "C" conservation district boundaries.  Except as otherwise provided in this chapter, in determining the boundaries for the "C" conservation district, the following standards shall apply:
>
> . . . .
>
> (6)  It shall include lands having an elevation below the shoreline as stated by section 205A-I, HRS, [and] marine waters . . . .

---

[43]     Additionally, as discussed in the preceding section, the term "lands" includes "submerged lands" and "waters."

HAR § 15-15-20(6) (effective 1997) (emphases added).  In addition, HAR § 15-15-22(a)(2) (effective 1997) provides that in interpreting district boundaries, "[l]and having an elevation below the shoreline [and] marine waters . . . of the State[] . . . shall be included in the conservation district."  HAR § 15-15-22(a)(2) (effective 1997).  Thus, the legislature and the Land Use Commission, through its statutory rulemaking authority, clearly included lands below the shoreline (i.e., submerged lands) and marine waters of the State within conservation districts.  See HRS § 205-2(e) (Supp. 2012); HAR § 15-15-20(6); HAR § 15-15-22(a)(2).

The inclusion of State marine waters within conservation districts designated by the Land Use Commission is reinforced by HRS § 190-1 (2011), which provides that "[a]ll marine waters of the State . . . constitute[] a marine life conservation area to be administered by the department of land and natural resources subject to this chapter and any other applicable laws not inconsistent herewith or with any rules adopted pursuant hereto."[44]  Consistent with its legislative mandate, DLNR has promulgated administrative rules that

---

[44]    Since 1990, the legislature has defined "state marine waters" "as extending from the upper reaches of the wash of the waves on shore seaward to the limit of the State's police power and management authority, including the United States territorial sea, notwithstanding any law to the contrary."  HRS § 190-1.5 (2011).

established subzones within conservation districts.[45]  A conservation district, under DLNR rules, encompasses subzones of "[l]ands and state marine waters seaward of the shoreline to the extent of the State's jurisdiction, unless placed in a [protective] or [limited] subzone."  HAR § 13-5-13(b)(5) (effective 1994) (emphasis added).  Accordingly, lands and State marine waters seaward of the shoreline under the State's jurisdiction, in which the aquarium collection practices challenged in this case are conducted, are within conservation districts classified by the Land Use Commission pursuant to its authority under HRS chapter 205 and thus fall within a category of land use enumerated in HEPA.

### 3. Whether Aquarium Collection is a "Use" Under HRS § 343–5

We next consider whether aquarium collection is a "use" under HRS § 343-5.  "Use" is also an undefined term under HEPA, and this court has previously observed that its ordinary meaning "could be construed to apply to any 'use' of state or county land, no matter what or how benign that 'use' may be."

---

[45]     DLNR's rulemaking power originates from the legislature, which has authorized DLNR to "establish and from time to time modify the limits of one or more conservation districts in each county and may, if it deems necessary, declare all waters within any county a conservation district." HRS § 190-2 (2011).  In addition, the legislature has required DLNR in HRS § 183C-3(7) (Supp. 1994) to "[e]stablish and enforce land use regulations on conservation district lands" and in HRS § 183C-4(b) and (d) (Supp. 1997) to "adopt rules governing the use of land within the boundaries of the conservation district" and to establish and define zones within the conservation district.

Nuuanu Valley Ass'n v. City & Cty. of Honolulu, 119 Hawai'i 90, 103, 194 P.3d 531, 544 (2008). Our court declined to adopt such a sweeping interpretation, concluding "that the boundaries of the meaning of the word 'use,' as contemplated by HRS § 343-5(a)(1), is not unlimited in possibilities." Id. In reaching this conclusion, the court noted that, in a previous case, we rejected the plaintiff's argument "that the 'potential use of' a public highway leading to [a development] project" "constitute[s] use of state land." Id. (quoting Citizens for Prot. of N. Kohala Coastline v. Cty. of Hawai'i, 91 Hawai'i 94, 103 n.8, 979 P.2d 1120, 1129 n.8 (1999)). Thus, this court concluded in Nuuanu Valley that merely connecting to an existing drainage system and county lines without any construction or tunneling beneath state or county lands was not a "use" within the meaning of that term in HRS § 343-5(a)(1). Id. at 103—04, 194 P.3d at 544—45.

What can be readily gleaned from Nuuanu Valley is that whether a proposed activity constitutes a "use of state or county lands" depends on the nature of the activity and the extent of the involvement of state or county lands. Id. at 103, 194 P.3d at 544. When the proposed activity utilizes state or county lands in a decidedly inconsequential or negligible manner, like the mere connection to state or county lands in Nuuanu Valley, or when the use is hypothetical, like the

54

"potential use" of a public highway in <u>Citizens</u>, then the activity does not rise to the level of "use" contemplated by HEPA.  When, on the other hand, the proposed activity utilizes state or county lands in an actual and more substantial way, the activity qualifies as a "use" under HEPA.  <u>Compare</u> <u>Nuuanu Valley</u>, 119 Hawai‘i at 103-04, 194 P.3d at 544-45 (connecting to existing county lines was not a "use"), <u>with</u> <u>Kahana Sunset Owners Ass'n v. Cty. of Maui</u>, 86 Hawai‘i 66, 71, 947 P.2d 378, 383 (1997) (installing a new drainage line beneath a public street that would be connected to an existing culvert beneath a public highway was a "use"), <u>Citizens</u>, 91 Hawai‘i at 103, 979 P.2d at 1129 (constructing two underpasses beneath a state highway was a "use"), <u>and</u> <u>Sierra Club v. Office of Planning, State of Haw.</u>, 109 Hawai‘i 411, 415-16, 126 P.3d 1098, 1102-03 (2006) (constructing sewage and water transmission lines by tunneling beneath state highways was a "use").

Permits for commercial aquarium collection allow for the unlimited collection of fish and other aquatic life, and each recreational permit authorizes the extraction of close to 2,000 fish or other aquatic life annually, subject to the terms and conditions of the permits and to certain restrictions set by law.  <u>See</u> HAR § 13-75-14; <u>see</u> <u>supra</u> note 21.  The aquatic life collected inhabits "state lands" and conservation districts, as

discussed, and are integral components of the State's reef ecosystem. Thus, aquarium collection utilizes "state lands" and conservation districts in an actual and substantial manner. Said differently, aquarium collection as allowed under commercial and recreational permits cannot be said to fall within the narrow spectrum of activities that this court has excluded from the meaning of the word "use" in Nuuanu Valley.[46] Accordingly, aquarium collection pursuant to permits issued under HRS § 188-31 qualifies as a "use of state . . . lands" and as a "use within . . . a conservation district."[47]

## C. Whether Aquarium Collection is Exempt under HRS § 343-6(a)(2)

Having determined that aquarium collection under HRS § 188-31 and DLNR's permitting scheme is a HEPA "action" that qualifies as a "use of state . . . lands," we proceed to the

_____

[46] DLNR argues that, if aquarium collection under HRS § 188-31 is considered a HEPA "action," all activities "in a government building or by a government employee" would be subject to environmental review pursuant to HEPA because those activities involve "the use of state or county lands or the use of state or county funds." This assertion is without merit because, as discussed, not all activities qualify as a "use," and activities such as "turning on the lights" in a government building, a hypothetical that DLNR asserts, are unquestionably not within the set of activities that qualify as a "use" under Nuuanu Valley.

[47] As stated, a parent netting one or two fish for recreational use would not fall within any of the categories listed in HRS § 343-5(a). See supra note 31. The reason is that the nature and magnitude of the involvement of marine waters and submerged lands in this type of activity are inconsequential and negligible such that this activity would not qualify as a "use" of state lands or conservation districts under HRS § 343-5(a). It follows that, if permits were issued for activities similarly limited in nature and magnitude as a parent collecting one or two fish for recreational purposes, the activities under such permits would also not be considered a "use" of state and conservation lands.

third part of the analysis: whether aquarium collection is exempt from HEPA environmental review.  HRS § 343-6 requires the Environmental Council to adopt, amend, or repeal rules that shall "[e]stablish procedures whereby specific types of actions, because they will probably have minimal or no significant effects on the environment, are declared exempt from the preparation of an environmental assessment."[48]  HRS § 343-6(a)(2) (2010).  The Environmental Council accordingly adopted categories of "actions" in HAR § 11-200-8(a) that "may be declared exempt by the proposing agency or approving agency from the preparation of an environmental assessment provided that

_____

[48]     HEPA defines "[s]ignificant effect" as

the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the State's environmental policies or long-term environmental goals as established by law, or adversely affect the economic welfare, social welfare, or cultural practices of the community and State.

HRS § 343-2 (2010).

HAR § 11-200-2 defines "effects" as follows:

"Effects" or "impacts" as used in this chapter are synonymous.  Effects may include ecological effects (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic effects, historic effects, cultural effects, economic effects, social effects, or health effects, whether primary, secondary, or cumulative.  Effects may also include those effects resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

HAR § 11-200-2 (effective 1996).

agencies declaring an action exempt under this section shall obtain the advice of other outside agencies or individuals having jurisdiction or expertise as to the propriety of the exemption." HAR § 11-200-8(a) (effective 1996). These categories include the operations, repairs, replacement or reconstruction of existing structures; construction and modification of certain small facilities or structures; minor alterations in the conditions of land, water, or vegetation; basic data collection and research activities; construction or placement of minor structures accessory to existing facilities; interior alterations; demolition of certain structures; certain zoning variances; continuing administrative activities; and acquisition of land and structures for the purpose of affordable housing. Id.

In addition, the Environmental Council decreed by administrative rule that "[e]ach agency, through time and experience, shall develop its own list of specific types of actions which fall within the exempt classes, as long as these lists are consistent with both the letter and intent expressed in these exempt classes and chapter 343, HRS." HAR § 11-200-8(d). The authority of the various agencies under HAR § 11-200-8(d), however, is not boundless. As this court explained in Kahana Sunset, the intent of the exemption list in HAR § 11-200-8, adopted pursuant to HRS § 343-6(a)(2), is "to exempt only

very minor projects from the ambit of HEPA." Kahana Sunset Owners Ass'n v. Cty. of Maui, 86 Hawaiʻi 66, 72, 947 P.2d 378, 384 (1997).  Thus, this court later held that, when developing lists of the exemptions pursuant to HAR § 11-200-8(d), an agency must preliminarily determine that the action to be declared exempt is a very minor project that "will 'probably have minimal or no significant effects on the environment.'"  Sierra Club v. Dep't of Transp. of the State of Haw., 115 Hawaiʻi 299, 316, 167 P.3d 292, 309 (2007).  Our decision in Sierra Club also concluded "that not only must the exemption list be developed with regard to the letter and intent of HEPA and its regulations, but so also must individual exemption determinations."  Id.  This means that individual exemption determinations must be determined to "probably have minimal or no significant effects on the environment."  Id. (quoting HAR § 11-200-2).

Guided by these principles, this court in Sierra Club concluded that an agency must make the following determinations in deciding whether a proposed activity is exempt from HEPA. Preliminarily, the agency must determine whether the action is part of a "group of actions" that must be "treated as a single action" pursuant to HAR § 11-200-7 (effective 1985). Thereafter, the agency must conduct a four-step analysis: an action is exempt from HEPA if (1) it is within an exempt class

59

promulgated by the Environmental Council in HAR § 11-200-8(a) or within an exemption category created by the agency itself pursuant to its authority under HAR § 11-200-8(d); (2) the relevant exemption category can be applied because the activity does not have a significant cumulative impact and it does not have a significant impact on a particularly sensitive environment, see HAR § 11-200-8(b); (3) the agency obtained the advice of other agencies or individuals having jurisdiction or expertise as to the propriety of the exemption, HAR § 11-200-8(a); and (4) the action will probably have minimal or no significant effects on the environment, HRS § 343-6(a)(2); see also HAR § 11-200-8(d); Sierra Club, 115 Hawai'i at 315—16, 167 P.3d at 308—09.  If the action fails to satisfy any of the four requirements discussed, it is not exempt from HEPA.  Sierra Club, 115 Hawai'i at 315—16, 167 P.3d at 308—09.

As a matter of law, it cannot be concluded that commercial aquarium collection, which involves the extraction of an unlimited number of fish and other aquatic life annually, may be exempt from HEPA because it does not qualify within any of the exemption categories in HAR § 11-200-8(a).  The most relevant exemption--"[m]inor alterations in the conditions of land, water, or vegetation" under HAR § 11-200-8(a)(4)--has no application because a permit for extraction of an unlimited number of aquatic life cannot be said to constitute only a

"[m]inor alteration" in the condition of State waters and submerged lands.[49]

With respect to recreational aquarium collection, which allows each permit holder to extract close to 2,000 fish or other aquatic life per year,[50] the record is not sufficiently developed so as to allow this court to determine whether this "action" may be exempted from HEPA under an exemption category in HAR § 11-200-8(a) or under DLNR's own exemption list promulgated pursuant to HAR § 11-200-8(d).[51]  In sum, commercial

---

[49]     With the Environmental Council's approval, DLNR has promulgated its own exemption list pursuant to its authority under HAR § 11-200-8(d). Exemption List for the Department of Land and Natural Resources (2015), http://oeqc.doh.hawaii.gov/Shared%20Documents/Environmental_Council/Exemption _Lists_By_Department/State_Agencies/DLNR_Comprehensive_Exemption_List_06-05-15_Final.pdf.  None of the exemption classes that DLNR adopted applies in this case.  The closest relevant exemption under Exemption Class 4--"[m]inor alterations in [S]tate waters, including restoration of native species and control of invasive weeds, algae, invertebrates, fishes or other invasive aquatic organisms"--does not apply because, as discussed, commercial aquarium collection cannot be said to constitute a "[m]inor alteration[] in [S]tate waters."

        Because we conclude that activities allowed by commercial aquarium collection permits do not qualify under any of the exemption categories in HAR § 11-200-8(a) and in DLNR's own exemption list, it is not necessary for this court to apply the other prongs of the exemption framework to commercial aquarium collection.

[50]     When the aquarium collector does not collect the maximum amount of aquatic animals authorized, the catch could be such that rarer, more vulnerable species are specifically targeted.

[51]     A parent collecting one or two fish for recreational use, aside from not falling within any of the categories under HRS § 343-5(a), may also be exempt from HEPA.  See supra note 31.  This is because this activity arguably falls under the exemption for minor alterations in the conditions of land, water, or vegetation, as discussed in this section.  Thus, if permits issued under HRS § 188-31 allow only activities similar in nature and magnitude as a parent collecting one or two fish for recreational purposes, the activity may also be exempt from HEPA within the framework discussed above.

aquarium collection is not exempted from HEPA, but the possibility that recreational aquarium collection as authorized under HRS § 188-31 and DLNR's administrative rules may be exempted should be explored further by the parties and the circuit court upon remand using the analytical framework discussed herein.

## D. Discretionary Consent

We have determined that aquarium collection is a HEPA "action" that qualifies as a use of state lands and that, while commercial aquarium collection is not exempted from HEPA's environmental review requirements, the record is not sufficiently developed for this court to determine whether the same is true for recreational aquarium collection. However, because aquarium collection has been cast in this case as an applicant action, in order for environmental review to be required under HEPA, there is an additional inquiry of whether issuing a permit for aquarium collection requires "approval of an agency." HRS § 343-5(e) (Supp. 2012).[52]

---

[52]    In relevant part, HRS § 343-5(e) provides as follows:

(e)    Whenever an applicant proposes an action specified by subsection (a) that requires approval of an agency and that is not a specific type of action declared exempt under section 343-6, the agency initially receiving and agreeing to process the request for approval shall require the applicant to prepare an environmental assessment of the proposed action at the earliest

(continued . . .)

"Approval," as defined by HEPA, "means a discretionary consent required from an agency prior to actual implementation of an action." HRS § 343-2 (2010). "'Discretionary consent' means a consent, sanction, or recommendation from an agency for which judgment and free will may be exercised by the issuing agency, as distinguished from a ministerial consent." Id. DLNR contends that it does not issue an "approval" because it does not exercise discretion whenever it issues aquarium collection permits pursuant to HRS § 188-31 (2011) and that, therefore, HEPA does not apply to aquarium collection.

---

(continued . . .)

    practicable time to determine whether an environmental
    impact statement shall be required . . . .

HRS § 343-5(e) (emphasis added).

   In their reply, Petitioners argue that the ICA's holding regarding DLNR's discretionary authority is not properly before this court because DLNR did not cross-file an application for writ of certiorari challenging that portion of the ICA's published opinion. However, whether discretionary authority exists is a "subsidiary question fairly comprised" by the issue presented in Petitioners' application for writ of certiorari-- whether aquarium collection pursuant to HRS § 188-31 and DLNR's administrative rules requires HEPA review--because, as explained, in order to ultimately resolve the issue presented, this court must determine whether DLNR exercises discretionary consent in granting HRS § 188-31 aquarium permits. Hawai'i Rules of Appellate Procedure (HRAP) Rule 40.1(d)(1) (2016) ("The statement of a question presented will be deemed to include every subsidiary question fairly comprised therein."). In addition, we reach the question of discretionary authority as part of our duty to consider any grounds upon which the circuit court's summary judgment ruling may be affirmed. See supra note 37.

HRS § 188-31 expressly provides that DLNR, "upon receipt of a written application, <u>may</u> issue an aquarium fish permit, not longer than one year in duration, to use fine meshed traps, or fine meshed nets other than throw nets, for the taking of marine or freshwater nongame fish and other aquatic life for aquarium purposes."[53]  HRS § 188-31(a) (emphasis added).  "The term 'may' is generally construed to render optional,

---

[53]    As stated, HRS § 188-31 provides the following:

        (a)    Except as prohibited by law, the department, upon receipt of a written application, <u>may</u> issue an aquarium fish permit, not longer than one year in duration, to use fine meshed traps, or fine meshed nets other than throw nets, for the taking of marine or freshwater nongame fish and other aquatic life for aquarium purposes.

        (b)    Except as prohibited by law, the permits <u>shall</u> be issued only to persons who can satisfy the department that they possess facilities to and can maintain fish and other aquatic life alive and in reasonable health.

        (c)    It <u>shall</u> be illegal to sell or offer for sale any fish and other aquatic life taken under an aquarium fish permit unless those fish and other aquatic life are sold alive for aquarium purposes.

        The department <u>may</u> adopt rules pursuant to chapter 91 for the purpose of this section.

    (d) For the purposes of this section:

      (1) "Aquarium purposes" means to hold salt water fish, freshwater nongame fish, or other aquatic life alive in a state of captivity as pets, for scientific study, or for public exhibition or display, or for sale for these purposes; and

      (2) "Aquarium fish permit" means a permit issued by the board for the use of fine mesh nets and traps to take salt water fish, freshwater nongame fish, or other aquatic life for aquarium purposes.

HRS § 188-31 (emphases added).

permissive, or discretionary the provision in which it is embodied; this is so at least when there is nothing in the wording, sense, or policy of the provision demanding an unusual interpretation." State v. Kahawai, 103 Hawai'i 462, 465, 83 P.3d 725, 728 (2004) (quoting State ex rel. City of Niles v. Bernard, 372 N.E.2d 339, 341 (Ohio 1978)). Where "may" and "shall" "are used in the same statute, especially where they are used in close juxtaposition, we infer that the legislature realized the difference in meaning and intended that the verbs used should carry with them their ordinary meanings." State v. Cornelio, 84 Hawai'i 476, 493, 935 P.2d 1021, 1038 (1997) (quoting Gray v. Admin. Dir. of the Court, State of Haw., 84 Hawai'i 138, 149, 931 P.2d 580, 591 (1997)). In such instances, "the close proximity of the contrasting verbs 'may' and 'shall' requires a non-mandatory, i.e., a discretionary, construction of the term 'may.'" Id. (quoting Gray, 84 Hawai'i at 149, 931 P.2d at 591).

In HRS § 188-31, "may" is used in subsection (a), where DLNR is given the authority to issue aquarium collection permits. The verb "shall" is then used in subsection (b), which provides that "the permits shall be issued only to persons who can satisfy the department that they possess facilities to and can maintain fish and other aquatic life alive and in reasonable health." HRS § 188-31(b). The verbs "shall" and "may" are both

65

used in subsection (c), which states that "[i]t shall be illegal to sell or offer for sale any fish and other aquatic life taken under an aquarium fish permit unless those fish and other aquatic life are sold alive for aquarium purposes" and that "[t]he department may adopt rules pursuant to chapter 91 for the purpose of this section."  HRS § 188-31(c).  Thus, the verbs "may" and "shall" are used "in close juxtaposition" in HRS § 188-31, and the legislature should be presumed to have done so deliberately and with full knowledge of the difference between the ordinary significations of these verbs.  Cornelio, 84 Hawai'i at 493, 935 P.2d at 1038.  As such, the use of the verb "may" in subsection (a) "render optional, permissive, or discretionary" DLNR's statutory authority to issue aquarium collection permits pursuant to HRS § 188-31.  Kahawai, 103 Hawai'i at 465, 83 P.3d at 728.

HRS § 188-31(b) provides further indication that DLNR possesses the authority to exercise discretionary consent in the aquarium collection permitting process.  Subsection (b) of HRS § 188-31 provides that "the permits shall be issued only to persons who can satisfy the department that they possess facilities to and can maintain fish and other aquatic life alive and in reasonable health."  HRS § 188-31(b) (emphasis added).  Accordingly, HRS § 188-31(b) explicitly allows DLNR to exercise its independent judgment in determining whether a permit

applicant possesses facilities to and can maintain fish and other aquatic life alive and in reasonable health.  See HRS § 343-2 (defining discretionary consent as "a consent, sanction, or recommendation from an agency for which judgment and free will may be exercised by the issuing agency, as distinguished from a ministerial consent").  If DLNR is not satisfied that a permit applicant has the ability to comply with the provisions of HRS § 188-31(b), DLNR has the statutory discretion not to issue an aquarium collection permit.  Not only does DLNR exercise its independent judgment pursuant to HRS § 188-31(b), DLNR is also authorized, under HRS § 188-31(c), to adopt administrative rules to effectuate the aquarium collection permitting scheme.  HRS § 188-31(c).  As the ICA also recognized, the legislative history of HRS § 188-31 makes DLNR's discretionary authority clear, as the statute "provides safeguards so that the abuse of the privilege of using fine mesh nets can be prevented."  Umberger v. Dep't of Land & Nat. Resources, 138 Hawai'i 508, 518, 382 P.3d 320, 330 (App. 2016) (emphasis omitted) (quoting H. Stand. Comm. Rep. No. 586, in 1953 House Journal, at 675).  Thus, there is no merit to DLNR's argument that it does not possess the authority to exercise discretionary consent in the aquarium collection permitting process.

DLNR further argues that it does not exercise discretion in issuing aquarium collection permits because "[t]he application process is on-line and completely automatic." However, the fact that DLNR has chosen not to exercise its discretion under the plain and unambiguous language of HRS § 188-31 does not nullify the statute's clear directive that DLNR is given the authority to exercise discretionary consent.  An agency may not defeat the express provisions of a statute simply by operating in a manner that does not comport with the legislature's grant of authority.  See Hyland v. Gonzales, 139 Hawai‘i 386, 382, 390 P.3d 1273, 1279 (2017) (concluding that the local election board's interpretation of its regulation must be consistent with the act being administered and that the board cannot contradict the statute that it is attempting to implement).  This would also be contrary to the principle, recognized by a majority of this court, that "[a]n agency is a creature of the legislature, and the scope of its authority is specifically delineated by statute."  Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawai‘i 376, 413 n.14, 363 P.3d 224, 261 n.14 (2015) (Pollack, J., concurring).

To conclude, DLNR's challenge to the ICA's holding that DLNR has discretionary consent is without merit.  Thus, aquarium collection pursuant to permits issued under HRS § 188-31 is an applicant action that requires agency approval.

## E. Summary Judgment

The circuit court granted DLNR's motion for summary judgment and, correspondingly, denied Petitioners' summary judgment motion upon concluding that aquarium collection under HRS § 188-31 (2011) is not a HEPA "action."  This court's framework in reviewing decisions regarding summary judgment is as follows:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.  The evidence must be viewed in the light most favorable to the non-moving party.  In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

Lambert v. Waha, 137 Hawaiʻi 423, 432 n.9, 375 P.3d 202, 211 n.9 (2016) (quoting Querubin v. Thronas, 107 Hawaiʻi 48, 56, 109 P.3d 689, 697 (2005)).  The burden is on the moving party "to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitles the moving party to judgment as a matter of law."  French v. Haw. Pizza Hut, Inc., 105 Hawaiʻi 462, 470, 99 P.3d 1046, 1054 (2004) (quoting GECC Fin. Corp. v. Jaffarian, 79 Hawaiʻi 516, 521, 904 P.2d 530, 535 (App. 1995)).  Only after the moving party satisfies its initial burden would the burden shift to the

nonmoving party to "demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial."  Id. (emphasis omitted) (quoting GECC Fin. Corp., 79 Hawai'i at 521, 904 P.2d at 535).

Because aquarium collection pursuant to commercial and recreational permits issued by DLNR is a HEPA "action," the circuit court erred in granting DLNR's motion for summary judgment on the basis that aquarium collection is not a HEPA "action."  The circuit court also erred to the extent that it denied Petitioners' summary judgment motion with respect to commercial aquarium collection permits because, as discussed, the authorized conduct under such permits is an applicant "action" under HEPA, is a use of state lands and a use within a conservation district, is not exempted from HEPA, and is subject to DLNR's discretionary consent.  Thus, the conduct allowed under commercial aquarium collection permits, issued pursuant to HRS § 188-31 and DLNR's administrative scheme, is subject to HEPA environmental review, and there is no genuine issue of material fact as to this issue.  To the extent that the circuit court did not grant Petitioners' summary judgment motion with respect to recreational aquarium collection permits, it did not err because the record is not sufficiently developed so as to allow the circuit court to determine whether activities allowed under recreational permits may be exempted from HEPA

environmental review.  In other words, there was a genuine issue of material fact as to whether activities authorized by recreational permits are subject to HEPA review.

In summary, the circuit court erred in granting DLNR summary judgment and in denying Petitioners' summary judgment motion with respect to commercial aquarium collection permits. The circuit court did not err in denying Petitioners' motion for summary judgment with respect to recreational aquarium collection permits.

We note that HRS § 343-5(g) (Supp. 2012) provides that agencies, in preparing an environmental assessment, "may consider and, where applicable and appropriate, incorporate by reference, in whole or in part, previous determinations of whether a statement is required and previously accepted statements."  HRS 343-5(g) (Supp. 2012).  A similar authority, derived from HRS § 343-5, exists in HAR § 11-200-13(a) (effective 1996), providing "that whenever an agency proposes to implement an action or receives a request for approval, the agency may consider and, when applicable and appropriate, incorporate by reference, in whole or in part, previous determinations of whether a statement is required, and previously accepted statements."  These provisions alleviate the concern that an environmental assessment would necessarily have to be prepared whenever an applicant applies for an aquarium

collection permit.  Further, "a group of proposed actions may be treated by a single environmental assessment or statement," HRS § 343-6(a)(1) (2010), when "[t]he actions in question are essentially identical and a single statement will adequately address the impacts of each individual action and those of the group of actions as a whole," HAR § 11-200-7 (effective 1985). Such an approach can assuage concerns about aquarium collectors not having the resources to comply with HEPA.

On remand, the circuit court is directed to grant Petitioners' summary judgment motion to the extent that Petitioners are requesting declaratory relief and a prohibitory injunction as to commercial aquarium collection pursuant to permits issued under HRS § 188-31 and DLNR's administrative rules.  Further proceedings are necessary, however, in order to determine whether Petitioners are entitled to declaratory relief and a prohibitory injunction as to recreational aquarium collection permits.

## VI. CONCLUSION

Accordingly, we vacate the ICA's judgment insofar as it affirmed the circuit court's judgment granting DLNR summary judgment.  The ICA's judgment is further vacated to the extent that it affirmed the circuit court's judgment denying Petitioners' motion for summary judgment with respect to commercial aquarium collection permits.  Similarly, the circuit

court's judgment is vacated insofar as it granted summary judgment to DLNR and denied Petitioners' summary judgment motion with respect to commercial aquarium collection permits.  The remaining portions of the judgments of the ICA and the circuit court are otherwise affirmed, and this case is remanded to the circuit court for further proceedings consistent with this opinion.

Paul H. Achitoff and
Summer Kupau-Odo
for petitioners

William J. Wynhoff
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

